# THE STATE v. EVERETT BOBBITT, Appellant.

### Division Two, April 17, 1912.

1. INSTRUCTIONS: Conspiracy: Arson. An instruction upon conspiracy to commit arson, covering the setting of the fire during the absence of the defendant, is held to be, as set out in the opinion, a clear statement of the law as applicable to the evidence.

2. ———: ———: ———: Evidence. In this prosecution for arson two witnesses testified to a conspiracy and implicated the defendant as a co-conspirator with them. The court in-

242 Sup.—18

structed the jury that the only question for them was "the guilt or innocence of the defendant," and that they should consider the guilt of the two witnesses mentioned "only as affecting their credibility." *Held*, that the instruction is not erroneous.

3. ———: ———: ———: Alibi. In this prosecution for arson there was evidence of a conspiracy to commit the crime which included the defendant. The court instructed the jury that, if they believed the defendant was elsewhere and they had a reasonable doubt of his presence at and during the commission of the crime, they should acquit him, unless they believed beyond a reasonable doubt that he was a party to the conspiracy and guilty under the other instructions. This instruction is challenged as not being "as full and complete as the defendant was entitled to." *Held*, that while the first part of the instruction is not happily expressed (a matter not complained of in the defendant's brief), yet it did not mislead the jury, and is not erroneous.

4. ———: ———: ———: ———: Covering Both Theories. Where the State prosecutes upon two theories, to-wit, that the defendant was either actually present at and during the commission of the crime, or that, though absent, he was a party to a conspiracy to commit the crime charged, an instruction was properly refused which, while it directed concerning actual participation, omitted reference to conspiracy.

5. COMPLETED CRIME: No Conviction of Attempt. Where the evidence is clear that the crime charged has been committed, the accused cannot be convicted of an attempt to commit it, and no instructions should be given on the latter theory. [R. S. 1909, sec. 4895.]

6. ARSON: Cross-Examination: Turning State's Evidence. Where the testimony of a witness who has turned state's evidence in a prosecution for arson and admitted his complicity in the offense charged, shows that he was arrested on a charge of forgery and made a statement to the prosecuting attorney concerning the arson; shows too that the forgery case has never been called for trial, but does not show that he was promised anything further; and where the examination as a whole fully covered the ground and showed contradictory statements so that the jury evidently would not have convicted on his evidence had it not been corroborated by the undisputed facts, it cannot be said that the trial court did not allow a sufficiently full cross-examination of the witness regarding the failure to prosecute him.

7. CROSS-EXAMINATION: Scope. The largest possible scope should be given to cross-examination, left chiefly to the discretion of the trial court, and the Supreme Court cannot say that

such discretion has been abused when there is nothing in the record to show that the witness's answers would have impeached him or benefited the defendant.

8. ———: ———: ———: Impeaching Witness: Threats. Where a State's witness has already been thoroughly discredited, the Supreme Court will refuse to reverse the case because the trial court would not permit an attempt on cross-examination to show that his statement to the prosecuting attorney had been obtained by means of threats.

9. CONSPIRACY: Statements of Conspirators after Termination. Cross-examination of one conspirator concerning his actions in taking a co-conspirator home the next morning after the commission of the crime, did not violate the rule excluding statements in reference to the transaction made by a conspirator after the termination of the conspiracy.

Appeal from Boone Circuit Court.—*Hon. David H. Harris*, Judge.

AFFIRMED.

*W. H. Rothwell, S. C. Major*, and *O. S. Barton* for appellant.

(1) The trial court erred in refusing to permit the attorneys for the defendant to fully cross-examine the witnesses Noble Peacher and Rollie D. Kivett, the accomplices who testified for the State and on whose testimony the State relied for a conviction. Wharton, Crim. Evidence (9 Ed.), sec. 444; Rapalje, Evidence, p. 416, sec. 252. (2) The court erred in giving instruction 2, on the part of the State. The theory on which the State tried the case was that there was a conspiracy between the defendant, Everett Bobbitt, and Rollie D. Kivett, Noble Peacher, Robert Goodwin, Joe Stewart, and J. E. Bobbitt, to set fire to the dwelling house of Franklin Smith. That the defendant, Everett Bobbitt, Joe Stewart, Rollie D. Kivett and Noble Peacher, went to the house and actually participated in the burning or being there present did aid and assist the others. The theory of the State was that J. E. Bobbitt and Robert Good-

win remained at home while the others were actually present. The evidence connecting this defendant with the conspiracy (Kivett's and Peacher's) is the same evidence that shows them present, aiding and assisting. (3) Instruction 3 should not have been given. If the jury in considering the case under the evidence concluded that Kivett and Peacher alone were guilty as the defendant contended, he, the defendant, should have been acquitted, and instruction 6, offered by the defendant and refused by the court, correctly presented that branch of the case. (4) Instruction 9, given by the court, on the defense of alibi, is not as full and complete as the defendant was entitled to. This was the defendant's sole defense. He offered an instruction defining this defense and the only objection that can be urged against it is that it requires more of the defendant than it should. State v. Glasscock, 232 Mo. 294. As stated in State v. Harris, 232 Mo. at 321, the defendant was entitled to an instruction on alibi that fully covered the proposition, just as full and complete an instruction as he could properly have claimed had he requested it, and in case "an instruction offered by the defendant is refused because defective in form or phraseology, it then becomes the duty of the court to give a proper instruction covering the point." "If the defendant requests it clearly the court must instruct in a proper case, and must fully cover the point." State v. Kilgore, 70 Mo. 546; State v. Reed, 154 Mo. 129; State v. Bobbitt, 228 Mo. 252; Mullins v. People, 110 Ill. 42; State v. Taylor, 118 Mo. 153; People v. Tong-Ali-Sing, 64 Cal. 253; Shoemaker v. Territory, 4 Okla. 118. (5) The court should have instructed upon attempted arson. State v. Bobbitt, 228 Mo. 262. (6) The defense should have been permitted to show all the facts relating to Kivett's turning State's evidence. It was proper as affecting his credibility. State v. Miller, 100 Mo. 606; State v. Piney, 137 Mo. 102. (7) There was reversible error

in the trial court permitting the attorney for the State
to cross-examine Robert Goodwin as to his acts after
the commission of the offense. State v. Davis, 80 Mo.
App. 230.

*Elliott W. Major,* Attorney-General, and *John M.
Atkinson,* Assistant Attorney-General, for the State.

(1) The court did not err in giving State's in-
struction 2. State's instruction 1 presented the case
to the jury on the theory of the conspiracy having
been formed to burn the house, and that appellant was
present and actually set fire to the house, or was pres-
ent, aiding and assisting the other co-conspirators to
burn the house. Said instruction 2 presented the case
to the jury on the theory that the conspiracy was en-
tered into to burn the house by appellant and others,
and that appellant and said Stewart went home and
was not present when the house was set afire. The
proof fully warranted the court in giving said instruc-
tion 2 and submitting this cause to the jury on both
of said theories. In no way are instructions 1 and 2
in conflict, nor could they in the least have confused
the issue of appellant's guilt before the jury. (2)
The court did not err in giving State's instruction 3.
This instruction was given in the former trial as in-
struction 8. This court fully approved it as a correct
declaration of law on that phase of the case. State v.
Bobbitt, 228 Mo. 267. (3) Instruction 9 is full, fair
and complete. It covers every phase of the law on
alibi. State v. Glasscock, 232 Mo. 294; State v. Bar-
ton, 214 Mo. 322; State v. Cushenberry, 157 Mo. 168;
State v. Bryant, 134 Mo. 252; State v. Batemen, 196
Mo. 39; State v. Jones, 153 Mo. 461; State v. Taylor,
134 Mo. 152; State v. Sanders, 106 Mo. 195. (4) It
is further contended that the court erred in permit-
ting counsel for the State to cross-examine Robert
Goodwin as to certain of his acts after the commission

of the offense and the termination of the conspiracy. All of his evidence was brought out without objection, except as to the question, "Why did you come back home?" and his answer, "Because I had business at home and none away from home that I knew of at that time." This answer could in no way have been prejudicial to appellant, and therefore it could not avail appellant as a ground for reversing the judgment of conviction in this cause. State v. Kretschmar, 232 Mo. 29.

ROY, C.—On the night of March 18, 1907, fire was set to the house of Franklin Smith in Howard county, and Smith was shot and killed. The fire was extinguished without having done much damage to the building.

Information was filed against defendant and Joe Stewart, charging them with the offense of arson. A change of venue was taken to Boone county, where both were convicted of an attempt to commit arson, and on appeal this court reversed the judgment and remanded the cause. [State v. Bobbitt, 228 Mo. 252.]

There was a severance. Stewart was tried and acquitted, and the defendant on November 22, 1910, was convicted of arson in the first degree and sentenced to five years in the penitentiary, and has appealed.

At the time of the alleged offense Smith was living two miles and a half north of Boonsboro, on land belonging to J. E. (Enoch) Bobbitt, the father of defendant. There was then pending a suit for possession of the land, brought by Enoch Bobbitt against Smith. The elder Bobbitt was often under the influence of liquor and had often made threats against Smith, who is spoken of as an "old man." He had nine children, seven of whom were at home on the fatal night, two sons and five daughters. In addition there were sleeping in the house the father and mother

and Mr. Sartain, the constable, who had come to serve some notice with reference to the pending suit.

On the same night, just at the northern edge of Boonsboro, at the house of Robert Goodwin, a son-in-law of the elder Bobbitt, was another company. Goodwin's family consisted of himself and wife and two little boys. That company had gathered, if we consider defendant's evidence alone, under the following circumstances: Enoch Bobbitt lived at Goodwin's. The defendant lived about a mile and a half north and a little east of Smith's, and about three and a half miles from Goodwin's. Joe Stewart was living with defendant, whose mother was at defendant's house on the night of the killing. While defendant and Stewart were at supper, the elder Bobbitt hallooed from the road in front of the house. Defendant and Stewart went to him. He was so drunk that he fell from his horse, but insisted on going to Goodwin's, refusing to go into defendant's house, saying that his wife was in there, and that he *had business at Goodwin's.* According to defendant's testimony, he and Stewart walked beside the father, who rode part of the time and walked part of the time, until they reached Goodwin's, where the father lay on the floor.

Goodwin testified for defendant that he brought Rollie Kivett to his house that night from Franklin Junction, a distance of six or seven miles, because he wanted to see him about renting Kivett some land, about thirty acres, not cultivated and in the bottom with some brush on it. Kivett was in the employ of the railroad at the round house, and was of kin to defendant. The next morning Goodwin took Kivett to the house of the latter's father, a distance of four or five miles. The land was not leased to Kivett. Shortly after the death of Smith, Kivett was arrested under an information charging him with the forgery of his father-in-law's name sometime before to the amount of $4000, under which charge he has not been im-

prisoned or tried.   Goodwin further testified that after he got to his home with Kivett, he went into Boonsboro, at Kivett's request, and telephoned to Noble Peacher to come to his house.   Peacher was about fifteen years old, and had lived at Enoch Bobbitt's for nine years until he had recently gone to Clay Bobbitt's, another son of Enoch.

Peacher reached Goodwin's about seven or eight o'clock.   The defendant, Stewart, Peacher and Kivett played cards and drank some whiskey.   Goodwin testified that defendant and Stewart left his house about ten o'clock that night, and that soon after they left, he showed Kivett and Peacher into the same room with Enoch Bobbitt, all sleeping in the same bed, and that they were there in bed when later on the telephone rang and some one said on the wire that Smith was killed.

The above facts as to why the persons were at Goodwin's are established by the testimony for the defendant.   The defendant's brief concedes that the persons who killed Smith and set fire to his house went from Goodwin's house to do the deed and asserts that those persons were Rollie Kivett and Noble Peacher.

Mrs. Smith, the widow, testified that it was about midnight when they went to bed.   After they had been in bed not over fifteen minutes, she saw a light.   She thought her son and Mr. Sartain had gone with lanterns to see about the horses.   Then she saw a bigger light, and, jumping up, she cried, "The house is on fire!"   Her husband started out and then turned back and got his pistol.   His wife opened the door and passed out on the porch, and he passed her on the porch out on to the ground.   She testified: "I was trying to knock the pole down off the house.   There had been a handkerchief tied on the pole and it was saturated in coal oil, and a lot of waste thrown up on the roof, which was saturated in coal oil, and I was

State v. Bobbitt.

trying to knock it down, and he looked up over his shoulder and said, 'Don't knock it down,' and just then he was shot and fell and riz up and said, 'Oh! they have shot me.' I saw the glimpse of the man who fired the last shot, I could not tell who it was. We found an old sack up there on the waste, and there was coal oil spilled on the floor where they had saturated the waste.

"Q. Did you see those after you had knocked the pole down or before? A. It was before, because we got the fire down after the last short was fired. Q. Did you see them on the ground after they had been knocked down? A. Yes, sir. Q. That was after the pole had been knocked down? A. I knocked the pole down myself and my son got a ladder and taken a bucket of water and put it on the fire and dashed the things off."

On cross-examination: "At the time you knocked the pole down there was something on the pole burning, and something on the roof burning? A. Yes, sir, and it caught a little in the roof, but the waste and the sack was burning more than the roof. The roof was burning. Q. You didn't set the house afire by knocking the pole down? A. No, sir, it is reasonable that I didn't set the house afire. They got up there and put the water on and it didn't burn after that. They dashed the water on and that knocked the sack off. There was a place burned in the roof. I could not say whether the shingles were burned into."

Vaughn Smith, on cross-examination by defendant, said: "Q. You don't know of your own knowledge who set this house afire? A. No, sir. Q. Was the roof burned? A. It was afire and I put it out. Q. Did you look at it the next morning? A. Yes, sir. Q. State whether the shingles were charred? A. Yes, sir. Q. Was there a hole burned in the roof? A. Not through, no, sir. Q. This fire, as I understand it, was put on the porch about half-way up to the L,

was it not, close to the edge? Close to the back edge of the porch? A. Yes, sir.''

Rollie Kivett testified: ''We took a pole and tied some waste on it and saturated it with coal oil. And then we had a meal sack and saturated that with coal oil and one hung the sack on the pole and laid it up on the roof, and Joe Stewart struck a match to the waste with the oil on it and laid it over on the sack, and we went out of the yard then. The sack was found to be marked with the letter B.''

The State's evidence tended to show that the tracks of four men were found going from the direction of Smith's house towards Boonsboro until they got on to the hill near the rye field, where they divided two and two, one pair going on towards Goodwin's and the other pair was not followed.

Rollie Kivett testified that on February 16, 1907, he talked with defendant, at Franklin Junction, when defendant told him that his father was in a law suit with Smith and wanted him (defendant) to burn Smith's house, and would give defendant twenty dollars to burn it, and that defendant would give witness half of it to go with him, and when defendant started to leave said he would call the liveryman, Mr. Black, and tell him that the trade was all right and for witness to come ahead and he thought the old man would give witness twenty dollars. Mr. Black testified that defendant did call him over the telephone and told him to tell Kivett the trade was all right, about a week and a half before the killing. Kivett further testified that Enoch Bobbitt at various times insisted that the witness come and help him burn Smith's house, and that on March 3 he tried to get witness to come and offered him twenty dollars, and part of the insurance if he got any. That on March, 18, Enoch Bobbitt, the defendant being present, at Boonsboro, wanted witness to go with Everett that night to burn the house, and said to witness, ''I am going to send

for you and if you don't come I am going to prosecute you for forgery.'' That later that day Goodwin came to his house and said to him that old man Bobbitt had sent after witness to help Everett Bobbitt, Joe Stewart and Noble Peacher burn Smith's house. That Goodwin said the old man would give witness fifty dollars, and if witness did not come he would be prosecuted. That Goodwin, to induce witness's wife to consent for him to go, told her that he wanted witness to make a land deal for him, and he would give witness fifty dollars and the wife a silk dress. That they got to Goodwin's house about eight o'clock, they played cards, drank some whiskey, until between eleven and twelve o'clock, when witness, defendant, Peacher and Stewart went to Smith's, set fire to the house and killed him, then ran away to the southwest near the rye field where they divided as above stated. That witness took the waste with him from Franklin Junction.

Noble Peacher testified that he had lived with Enoch Bobbitt for about nine years and until about two weeks before the killing, when he had gone to Clay Bobbitt's. He was in Boonsboro that afternoon, and got some coal oil and left it at Goodwin's, then took Mrs. Enoch Bobbitt up to Everett Bobbitt's, then went back to Clay Bobbitt's, and thence to Goodwin's. That they played cards at Goodwin's, and talked about burning or scaring Smith out, the defendant, Stewart, Kivett, Goodwin and Enoch Bobbitt being present. About ten or eleven o'clock they went out on the porch, got the coal oil and a sack and waste, and Kivett went to the barn and got some whiskey, and that Stewart, Kivett, the witness and defendant left Goodwin's and went over to Smith's house to burn it. On the way over they cut a pole; witness was sent south of the garden, which was south of the house, to attract the dog. After the fire was started and Smith killed, they ran back to where they had cut the pole near the rye

field and separated, witness and Kivett going back to Goodwin's and to bed, and the defendant and Stewart going another way. Peacher pleaded guilty to arson in connection with this offense and was sent to the reform school and was out by good behavior at the time of trial.

On the trial, the defendant, Goodwin and Stewart all denied any connection with the crime. Defendant testified that he and Stewart got home about fifteen minutes after eleven and went to bed together upstairs; and that about two o'clock his mother or wife called him and he dressed and went downstairs to the telephone and was told that Smith had been killed, and defendant's mother asked him to have the telephone call up Goodwin's to see if her husband was there.

There was much evidence as to the good character of the defendant, and the bad character of Rollie Kivett and Peacher. Several witnesses for the State testified that there were tracks made by four people going from Smith's that night. Sheriff Gibson, who had been such for five or six years before the offense, testified that he got to Smith's about eight o'clock the next morning and found two tracks in the ash pile, and that he followed those tracks "down in the horse road and then two tracks joined them and they crossed the branch and up the hill and then two tracks went across the field," and that two tracks were lost in the leaves on top of the hill. Several witnesses for defendant testified that there were only two tracks going from the Smith house.

The appellant strongly insists that he was not permitted by the trial court to fully cross-examine some of the witnesses for the State. We will state the facts as to such matters in the course of our opinion.

The instructions so far as necessary to be stated were as follows:

"2. The court instructs the jury that if you believe from the evidence that the defendant, Everett

Bobbitt, at Howard county, Missouri, entered into a conspiracy, agreement and common design with Rollie D. Kivett, Noble Peacher, Robert Goodwin, Joe Stewart and J. E. Bobbitt, or any of them, to set fire to the dwelling house of Franklin Smith, and that thereafter one of said persons who had entered into such conspiracy and agreement, did, in prosecution thereof and according to said common design and while acting in concert with the defendant, Everett Bobbitt, at any time within three years prior to the 30th day of January, 1908, unlawfully, maliciously and feloniously set fire to the dwelling house of said Franklin Smith, in Howard county, Missouri, and that there was in said dwelling house at the time a human being, although you may believe that the defendant was not present at the time said house was set fire to, you should find the defendant guilty as charged in the information and assess his punishment at imprisonment in the penitentiary for a term of not less than five years.''

''3. The court instructs the jury that the only question for you to pass upon in this case is the guilt or innocence of the defendant, Everett Bobbitt, and you should consider the guilt of Rollie D. Kivett and Noble Peacher only as affecting their credibility as witnesses.''

''9. The court instructs the jury that if from all the evidence you believe the defendant was elsewhere than the place of the alleged burning at the time thereof and you have a reasonable doubt of the presence of the defendant at the time and place of said alleged burning, you should acquit him unless you further believe from all the evidence beyond a reasonable doubt that the defendant was a party to a conspiracy to burn the dwelling house of Franklin Smith and guilty under the other instructions of the court.''

''11. The court instructs the jury that the defendant is a competent witness in his own behalf and

his testimony is to be weighed by the same rules that govern the testimony of other witnesses, but in determining the weight to be given his testimony you may take into consideration the fact that he is the defendant in the case and his interest in the result of the trial.''

The defendant asked, and the court refused, the following instructions:

''3. ·The court instructs the jury that the State has submitted this case on two theories. The first being that the defendant was actually present and participated in the crime. To this theory the defendant interposes the defense known in law as an alibi, that is, that the defendant was at another place at the time of the commission of the crime, and the court instructs the jury, that such defense is as proper and as legitimate, if proved, as any other, and all the evidence bearing on that point should be carefully considered by the jury; and if in view of all the evidence, the jury have a reasonable doubt as to whether the defendant was in some other place when the crime was committed, they should give the defendant the benefit of the doubt and acquit him.''

''6. The court instructs the jury that if after considering all the evidence in this case you entertain a reasonable doubt as to whether the offense charged was committed by the defendant or some other person or persons in no way connected with defendant you should acquit the defendant.

''And you are further instructed, that it is the law that although it may be positively proved that one of the two or more persons committed a crime, yet if there is any reasonable doubt as to which is the guilty party, this defendant must be acquitted.''

I. Instruction numbered 2 for the State.is a clear statement of the law as applicable to the evidence.

II.   Instruction numbered 3 is substantially the same as one given on the former trial which was held not erroneous.

III.   Instruction numbered 9 given for the State on the subject of alibi is challenged as not being "as full and complete as defendant was entitled to," and defendant insists that his instruction numbered 3 should have been given.   The refused instruction left entirely out of view the question as to whether defendant was in a conspiracy to burn Smith's house, and was properly refused on that ground, as clearly shows in the former opinion in the case.   The first part of instruction.9 is not happily expressed, but we feel sure that it did not mislead the jury, and no complaint is made in defendant's brief of that part of the instruction.

IV.   Appellant contends that there should have been given an instruction on the subject of attempt to commit arson.   We have fully set out the evidence bearing on the question at the last trial, and a comparison of the evidence with the evidence of the former trial will show that, whereas at the first trial the evidence left it uncertain whether Mrs. Smith, in knocking down the pole, caused the burning sack and waste to fall on the roof from the pole, the evidence at the last trial is clear to the effect that the burning sack was on the roof before the attempt to knock the pole down.

Section 4895, Revised Statutes 1909, provides: "No person shall be convicted of an assault with an intent to commit a crime, or any other attempt to commit any offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person at the time of such assault, or in pursuance of such attempt."

In State v. Bell, 194 Mo. l. c. 267, it was held: "Giving full credit to the testimony for the State, it seems perfectly plain that the defendant was guilty of rape, but he was neither tried nor convicted of that offense, but merely of an attempt to commit, which the statute positively forbids." To the same effect are State v. White, 35 Mo. 500; State v. Lacey, 111 Mo. 513, and State v. Scott, 172 Mo. 536.

V.   Rollie Kivett testified that on March 18, Enoch Bobbitt threatened that if the witness did not help burn the house he would be prosecuted for forgery; and that when he was arrested, after the death of Smith, the arrest was not for murder or arson, but for forgery.   That when arrested he was taken to the office of Mr. Walker, the prosecuting attorney, where witness was told that he was charged with forgery, and asked by Mr. Walker if he did not want to make a statement about the Smith matter.   Witness told Mr. Walker that he was not in the Smith matter, and knew nothing about it.   Mr. Walker said to Kivett that he thought he was in it and told Kivett to think it over, and that if he (Kivett) wanted to make a statement, he (Walker) would come.   That witness told the sheriff, and that Mr. Walker came, and witness made his statement, and that the forgery case had never been called for trial.   That witness was out under bond.   Complaint is made that the trial court did not allow a full cross-examination of Kivett as to the pendency of the forgery case against him, and the failure to prosecute him for murder or arson or forgery.

We find that the evidence fully showed the facts above stated.   We find that the bill of exceptions nowhere shows that any attempt was made to prove that Kivett was promised anything further than the above facts tend to show.   The cross-examination was long and contains many questions which were proper and

which were excluded because they had already been answered. So in the cross-examination of Kivett and Peacher as to their various contradictory statements in the various trials growing out of the matter. Taking the examinations as a whole, they fully covered the ground and clearly showed glaring contradictions in the testimony of those witnesses, and the jury evidently would not have convicted on their evidence had it not been, in the essential facts, corroborated so strongly by the undisputed facts in the case.

Those undisputed facts are as follows: Defendant's mother was a Kivett and related to the witness Rollie Kivett; Peacher had grown up in the house of defendant's father, and defendant must have known him as few could have known him. Defendant, with Stewart, had taken his father, who was so drunk as to fall off his horse, from defendant's own home where defendant's mother was, a distance of three and a half miles, to Robert Goodwin's, because the father *had business there*. When they got to Goodwin's, they met Kivett and Peacher. Defendant's brother-in-law, Goodwin, had gone five or six miles to Franklin Junction to bring Kivett to his house on a land deal which never took place and existed only in pretense. Goodwin also went into Boonsboro and telephoned Peacher to come to his house. Goodwin also had every chance to know all about Kivett and Peacher. All held themselves on a level that night in a game of cards, and in the indulgence in liquor which is so dangerous when men are entering upon an enterprise the end of which cannot be clearly foreseen. Enoch Bobbitt's wife did not sleep with him that night. She was at defendant's. Her place in her husband's bed was taken by Kivett and Peacher. During the night those two were at Smith's house engaged in the crime there committed, and later on were again in Enoch Bobbitt's bed, and their going and coming had not been noted by Good-

win who had brought them to his house. Enoch Bobbitt was in a law suit against Smith. He had made numerous and dire threats against him. Neither Kivett nor Peacher, bad as they might be, was shown to have anything against Smith. There was strong evidence, including that of the experienced sheriff of the county, that there were tracks of four people going away from Smith's house that night.

VI. The witness Peacher had pleaded guilty to the charge of arson in connection with the burning of Smith's house and had been paroled from the Reform School, and later discharged from his parole. He was asked on cross-examination as follows: "How long was that [his discharge] after the trouble you had at the Whitehall Christmas tree? State's counsel: We object. The objection was sustained. When were you dismissed from the Reform School? A. July 18, 1908. Q. The following Christmas was you at a party at Whitehall school house? A. I was. Q. Was there a racket there? By State's counsel: We object to that as improper. By defendant's counsel: My contention is that this is cross-examination of a witness and this is an important State's witness and I have a right to ask him anything that would affect his credibility. The rule in this State gives a great deal of latitude. By the court: Any conduct on the part of the witness that would indicate that he is so degraded that it would affect his truthfulness, you could ask him. You might ask him something that would affect his credibility. I don't know what you are bringing out. By State's counsel: You can prove a general reputation for immorality and so forth, but not a specific act. By the court: Objection sustained."

We will not examine the propriety of the above rulings. The affair at the Whitehall school house was spoken of by defendant's counsel as a "racket." No further showing of its character appears. Peacher

was already known as a participant in the arson and murder. He had pleaded guilty and had been in the Reform School.

No question was asked or statement made which directly showed or implied that the witness had done anything at the schoolhouse that would tend to impeach his credibility. What was the "trouble" spoken of in one question and the "racket" spoken of in another? No question asked of the witness indicated whether he was an innocent or guilty participant in the trouble. We are aware that on cross-examination counsel is not required to state what he expects to prove by the witness. That would too often defeat the purposes of cross-examination. The fact sought to be dragged from the witness in this case was not a concealed one known only to the witness. A "racket" at a Christmas tree at the schoolhouse was likely to be known to many, and defendant's counsel knew enough of them to indicate to him the degree of the witness's culpability therein, yet he has brought this case here on appeal without a word in the record to indicate that the answer to the questions asked would have in any way benefited the defendant or impeached the witness. It would have been easy for counsel to have asked a question which would have implied such an answer as would discredit the witness. Yet he did not do so. We cannot reverse this case and send it back for the development of a fact that has not even impliedly been declared to exist.

As said by Wigmore on Evidence, sec. 1368, "The process of cross-examination is invaluable." In section 1367, he says, "It is beyond any doubt the greatest legal engine ever invented for the discovery of truth." Also in section 1368, "Cross-examination then . . . has for its first utility the extraction of the remaining qualifying circumstances, if any, known to the witness, but hitherto undisclosed by him. The facts which diminish and impeach the personal trust-

worthiness or credit of the witness will also, in every likelihood, have remained undisclosed on the direct examination. These it is the further function of the opponent's examination to extract.''

It is said that the ''largest possible scope'' should be given to cross-examination, that scope being left chiefly to the discretion of the trial court. We cannot say that such discretion has been abused in this case.

The witness Peacher on cross-examination testified as follows:

''Q. Did anybody talk to you about your testimony, what it was to be? A. I talked to Mr. Prosser and Mr. Walker.

''Q. Were they both in the room? A. Yes, sir.

''Q. Did Prosser get mad at you? A. I don't know that he did.

''Q. Did he abuse you? A. I don't know that he did.

''Q. Did he threaten you?

''By State's counsel: We object.'' Which objection was sustained.

We cannot understand why that objection was made. It should have been overruled. But we are not prepared to reverse the case on that ground. The witness was already thoroughly discredited with the jury. It was as hard to impeach him further as it was to ''gild refined gold.''

The only thing which gave credit to the testimony of either Kivett or Peacher was the thorough corroboration of the substantial and necessary facts testified to by them by the unquestioned facts in the case.

The point made that threats by Enoch Bobbitt were shown in evidence prior to the foundation of the alleged conspiracy is not borne out by the record. The cross-examination of Goodwin did not violate the rule excluding statements by a co-conspirator in reference to the transaction after the termination of the conspir-

acy. He was simply cross-examined as to his taking Kivett home the next morning.

There have been two convictions of this defendant of this charge. We do not see how a different result could be reached on another trial. We do not think that reversible error has been committed, and the judgment is affirmed. *Blair, C.,* having been of counsel, not sitting.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.