**STATE of Missouri, Respondent,**

v.

**Cecil BARRINER, Appellant.**

No. SC 84452.

Supreme Court of Missouri,
En Banc.

June 17, 2003.

As Modified on Denial of Rehearing
Aug. 26, 2003.

Deborah B. Wafer, Office of Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Adrian D. Crouse, Assistant Attorney General, Jefferson City, for respondent.

RICHARD B. TEITELMAN, Judge.

In 1999, Cecil Barriner was tried before a jury on two counts of first degree murder. He was found guilty and sentenced to death on both counts. On appeal, this Court reversed the convictions, and remanded for a new trial. *State v. Barriner,* 34 S.W.3d 139 (Mo. banc 2000).

In 2002, Barriner was given a new trial. Again, he was found guilty and sentenced to death on both counts. Barriner appeals. This Court has exclusive appellate jurisdiction. *Mo. Const. art. V, section 3.*

The trial court erred by excluding admissible evidence of hairs found at the crime scene. The error was prejudicial. The judgment is reversed, and the cause is remanded.

**Facts**

Candace ("Candy") Sisk and her grandmother Irene Sisk were murdered in their home on December 16, 1996. Viewed in the light most favorable to the verdict in Barriner's second trial for the murders, the facts are as follows.[1] *State v. Tisius,* 92 S.W.3d 751, 757 (Mo. banc 2002).

Barriner was in a relationship with Shirley Niswonger (Candy Sisk's mother) from 1993 to 1996. During his relationship with Niswonger, Barriner became acquainted with Candy and became aware of Irene. At the time of their deaths, Candy and Irene lived together at Irene's home in Tallapoosa, Missouri.[2] Niswonger was in prison.

In December 1996, Barriner was concerned that he had failed a urinalysis test and that his probation would be revoked. Before he left town, Barriner decided to rob Candy and Irene Sisk, believing that they were wealthy.

Late in the afternoon of December 15, 1996, Barriner visited friends, Daniel and Samantha Simmons, who lived in a town near Tallapoosa. Barriner was driving a white Ford Taurus. Barriner told Samantha that he was going to Tallapoosa because someone owed him money. Barriner left and returned 45 minutes later, stating that no one had been home.

---

1. For a statement of the facts from Barriner's first trial, see *State v. Barriner,* 34 S.W.3d 139, 141–144 (Mo. banc 2000).

2. Barriner was convicted of the January 1996 murders of Candy and Irene Sisk.

Daniel and Samantha then accompanied Barriner on a drive to Tallapoosa, where they twice drove by the Sisk house. Samantha noticed that Barriner was holding and playing with a purple Crown Royal bag. They all returned to the Simmons home, and Barriner left.

Shortly after 8 a.m. the next day, December 16, 1996, one of Sisk's neighbors saw a medium-sized white car with a male driver driving very slowly in front of the Sisk house. At about 8:45 a.m., Candy telephoned her aunt, Debbie Dubois, and said that a man had been to the house a short time earlier and told her grandmother that he had a Christmas gift for Candy from her mother in jail. Candy reported that her grandmother had said that the man had acted very strange and that the same man had been in Tallapoosa the day before asking where the Sisks lived. Candy told Dubois that her grandmother did not know the man. Candy said that she did not see the man closely, but did see that he was driving a white Ford Taurus. Dubois agreed to ask a relative to check on Candy and Irene, but Dubois was unable to reach the relative. Dubois called Candy back and told Candy to telephone her again if the man returned.

Shortly after 9 a.m., a man driving a white Ford approached a bank teller at a drive-up window a few miles from Tallapoosa, asking for service in cashing a check. The teller saw and recognized Candy in the front passenger seat of the car. She saw another woman in the back seat. Candy was wearing nightclothes and had a blanket over her legs. The man presented a check for $1,000 signed by Candy and drawn on her account.

At approximately 11 a.m., Dubois visited the Sisk house and discovered Candy and Irene dead.

Candy's body was lying on the bed in her bedroom. Her hands had been bound in front with rope, and she was unclothed below the waist. She had suffered multiple injuries to her neck, causing her to bleed to death. At or near the time of her death, she was anally and vaginally violated with an object, resulting in severe lacerations to her rectum and vagina.

Irene's body was on the floor of her bedroom next to the bed. Her wrists and ankles were bound together with a length of rope. She had multiple stab wounds, and she died from having her throat slashed.

Police officers investigated the crime scene. Candy and Irene's purses were found near their bodies. Each purse had been opened and there were two checkbooks lying near Irene's purse. A check for $1,000 had been drawn to "cash" but not signed. A VCR was missing from Candy's bedroom. An empty box for a videotape of the movie "Independence Day" was near where the missing VCR had been. Telephones were missing.

A few hours after Candy and Irene's bodies were discovered, Barriner checked into a motel in Poplar Bluff. Barriner seemed a little edgy when he paid for the room in cash. He told the clerk that he wanted to be left alone. At 6 p.m., Barriner visited Kevin Dennis and gave him a VCR for use in salvaging parts.

Two days later, Barriner was contacted at his brother's home by officers Hinesly and Johnson. Barriner denied killing the Sisks and claimed that he had made trips to Cape Girardeau and two other towns on the day of the murders. When Hinesly disputed that, Barriner said he was actually using methamphetamine with Dennis when the murders occurred. Hinesly then interviewed Dennis, who denied being with Barriner at the time of the murders, but said that he had seen Barriner later that day when Barriner gave him the VCR.

The next day (three days after the murders), Hinesly interviewed Barriner a second time. Hinesly told him that his story had not been confirmed and described to Barriner other information that police had discovered thus far in the investigation. Barriner said that he wanted to tell Hinesly the truth, but could not, and asked to speak to his brother. Barriner's brother was summoned and consulted with Barriner, after which Barriner confessed.

Barriner told Hinesly that his intention had been to tie the victims up to give him enough time to escape. He stated that Candy wrote a check and that he took the Sisks to the bank, where they cashed the check. Barriner said that when they returned to the Sisk house, he tied up Candy and Irene. As he left the house, he saw that Irene had freed herself. When Barriner reentered the house to re-tie Irene, Candy and Irene were screaming, so he "shut them up." He denied sexually assaulting Candy and said that officers would not find any semen at the murder scene. Barriner stated that he wore gloves while in the Sisk house to avoid leaving fingerprints. He said that when he returned to Poplar Bluff, he checked into a motel because he was afraid he had been followed.

The officers did not videotape or audiotape the confession. Barriner refused to sign the standard "waiver of rights" form and did not write down his statement. The jury received evidence of Barriner's confession only through officer Hinesly's testimony.

The night of Barriner's confession, police searched the home of Barriner's brother, where Barriner resided. In Barriner's room, officers found 32 ropes and cords. A microscopic comparison of these ropes established that two of the ropes and four of the strands were consistent in color, composition and construction with the ropes that had been used to bind Candy and Irene. In a wastebasket, officers found several handwritten notes on index cards or small pieces of paper. One note bore a number of names, including the name "Candace." Another note had directions from Poplar Bluff (where Barriner lived) to the Sisk house. A third note stated: "Things for First Entrance ... gun (back)—handcuffs (pocket)—12 ft of rope (legs) in two 6 ft pieces—." The police also discovered a purple Crown Royal bag containing handcuffs, a duffel bag containing ropes, twine and a videotape of the movie "Independence Day" without the box. They found three telephones under Barriner's bed.

Officers also seized Barriner's white Ford Taurus. Traces of blood were found on the driver's door and door handle, the steering wheel, and the trunk clasp. According to DNA analysis, the blood on the driver's-side door handle was consistent with being a mixture of Irene's blood and that of another individual.

Barriner did not testify at trial.

### Hair

Police officers seized several hairs at the crime scene. Two of those hairs were seized in significant locations. One was found on Candy's thigh, and the other was found in one of the knots that bound Irene.

A state criminalist examined physical evidence from the crime scene (including the hairs) and was called as a witness by the state. When Barriner's counsel attempted to cross-examine the criminalist about the two hairs, the state made a motion in limine to prevent Barriner's counsel from eliciting testimony about the hairs. After approaching the bench, the state admitted that the hairs did not match either Barriner or the victims, stating that there "has been no connection of the hair

evidence in any of this to any individuals connected in this case." Defense counsel argued that "hair evidence that is seized from the scene, sent to the lab, compared with the Defendant, and ruled to exclude the Defendant and the victims in this case is no different than a fingerprint from a scene, . . . ." The trial court then ruled that "I'm going to sustain that motion in limine and direct you not to offer evidence that certain hair samples that were retrieved were not related to either the Defendant or the victims." This Court will rely upon the state's admission that the evidence would show that the hair was not from Barriner or either victim. Prosecutors "are presumed to have knowledge of all evidence in their possession." *State v. Hicks*, 535 S.W.2d 308, 312 (Mo.App.1976).

### Error

Barriner argues that the trial court erred in sustaining the state's objection, overruling defense offers of proof, and excluding the hair evidence. Barriner argues that the hair evidence was both legally and logically relevant and, therefore, admissible.

The state argues that the trial court correctly excluded the evidence on the theory that it was not exculpatory evidence and that it improperly tended to identify a third person as the perpetrator.

■ Generally, a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of the evidence is substantially outweighed by its costs (such as undue delay,

prejudice or confusion). 22A C.J.S. *Criminal Law* sec. 729 (2002). When the evidence is merely that another person had opportunity or motive to commit the offense, or the evidence is otherwise disconnected or remote (and there is no evidence that the other person committed an act directly connected to the offense), the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury. *State v. Davidson*, 982 S.W.2d 238, 242 (Mo. banc 1998); *State v. Wise*, 879 S.W.2d 494, 510–511 (Mo. banc 1994).

■ The evidence Barriner sought to present was more than the mere motive or opportunity of another person. It was not disconnected or remote. The hairs are physical evidence that could indicate another person's interaction with the victims at the crime scene. Barriner was entitled to present to the jury this evidence of another person's direct connection to the murders.[3] This case does not present one of the limited circumstances in which evidence tending to show that another person committed the offense is properly excluded.

■ Moreover, there was no other reason to exclude the evidence.[4] Evidence must be both logically and legally relevant in order to be admissible. *Tisius*, 92 S.W.3d at 760. "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate

---

3. Even if this evidence fails to directly connect another person to the murders, physical evidence obtained from murder victims' bodies lacks the same potential for confusion or misdirection caused by evidence found at a remote location or isolated evidence of another person's motive or opportunity.

4. "A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *State v. Mayes*, 63 S.W.3d 615, 629 (Mo. banc 2001).

evidence which itself is relevant and bears on the principal issue of the case." *Id.* (quoting *State v. Mathews,* 33 S.W.3d 658, 661 (Mo.App.2000)). Evidence is legally relevant if its probative value outweighs its costs—prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or cumulativeness. *State v. Anderson,* 76 S.W.3d 275, 276 (Mo. banc 2002).

The hair evidence was logically relevant. It would have tended to undercut the state's theory that Barriner removed Candy's clothes and that he bound Irene with rope.

The evidence was also legally relevant. As physical evidence that could indicate that another person interacted with Candy's body and the rope that bound Irene, the hairs have a high probative value. The costs of admitting the hair evidence would have been minimal. As discussed above, the hair evidence would not have confused or misled the jury. The evidence could have been elicited quickly from an expert witness who had already taken the stand, and the evidence would not have been cumulative.

Given the high probative value of this evidence and the minimal costs of its admission, it was a clear abuse of discretion to exclude it. The exculpatory evidence of the hairs found at the crime scene (one on Candy's thigh and the other found in the rope that bound Irene) was admissible. The trial court erred in excluding the evidence.

### Prejudice

■ "Trial court error does not require reversal unless there is a reasonable probability that the trial court's error affected the outcome of the trial. Otherwise, the error is not prejudicial." *State v. Rutter,*

93 S.W.3d 714, 728 (Mo. banc 2002) (citations omitted).

■ A trial court's exclusion of admissible evidence creates a presumption of prejudice, rebuttable by facts and circumstances of the particular case. *Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 22 (Mo. banc 1994). If the proof of defendant's guilt was overwhelming, the state will have rebutted the presumption of prejudice. *Felder v. State,* 88 S.W.3d 909, 914–915 (Mo.App.2002).

■ The excluded hair evidence was highly probative, while the evidence of Barriner's guilt was not overwhelming. Often, a confession will provide the state with an overwhelming case. However, Barriner's confession was not videotaped or audiotaped, and Barriner did not put his statement in writing. The jury received evidence of Barriner's confession only through an officer's testimony, requiring the jury to rely upon the officer's credibility and accurate memory. The remainder of the evidence was circumstantial. There was no eyewitness of Barriner committing the murders. There was no physical evidence implicating Barriner found at the crime scene (such as fingerprints, footprints, blood, semen or hair). The evidence of Barriner's guilt is not overwhelming, and it is insufficient to overcome the presumption of prejudice.

There is a reasonable probability that the trial court's exclusion of the admissible hair evidence affected the outcome of the trial. The error was prejudicial.

### Conclusion

Therefore, the trial court committed prejudicial error, depriving Barriner of a fair trial. The judgment is reversed, and the case is remanded.[5]

5. As Barriner has been granted a new trial, the other claims of error raised in this appeal

WHITE, WOLFF and STITH, JJ., concur.

LIMBAUGH, C.J., dissents in separate opinion filed.

BENTON, J., dissents in separate opinion filed.

PRICE, J., concurs in opinion of BENTON, J.

STEPHEN N. LIMBAUGH, JR., Chief Justice, dissenting.

Just as I dissented in the Court's reversal of the conviction and death sentence in the first trial, *State v. Barriner*, 34 S.W.3d 139, 153 (Mo. banc 2000), I must respectfully dissent in the reversal of the conviction and sentence in the second trial. The majority holds that "[t]here is a reasonable probability that the trial court's exclusion of the hair evidence affected the outcome of the trial." I would hold instead that the hair evidence was irrelevant, that the trial court committed no error in refusing to admit the evidence, and that even if the evidence should have been admitted, the error was not sufficiently prejudicial to warrant a new trial.

### I.

To be admissible, evidence must be both logically and legally relevant. *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002). After a review of the entire record, keeping in mind that all evidence and inferences therefrom are to be construed in favor of the trial court's ruling, *State v. Ervin*, 979 S.W.2d 149, 160 (Mo. banc 1998), I would hold that the hair evidence at issue in this case is neither.

"Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

need not be reviewed.

it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." *Tisius*, 92 S.W.3d at 760. Based on this definition, the majority concludes that the hair evidence excluded by the trial court—the hairs found on Candy Sisk's leg and on the rope used to tie Irene Sisk—was logically relevant because it "could indicate another person's interaction with the victims at the crime scene" and "tended to undercut the state's theory that Barriner removed Candy's clothes and that he bound Irene with rope." This was evidence, in other words, that would support appellant's theory that an unidentified third person committed the murders. The majority, however, reaches these conclusions only after first finding, erroneously so, that the evidence in the case established that the excluded hairs were tested against appellant *and* the victims, Candy and Irene, and shown not to belong to either. It arrives at this finding by plucking a single comment by the prosecutor from the record and labeling it as an "admission." The rest of the record, however, refutes this finding.

The trial court considered the issue of the hair evidence three separate times during trial. The first instance occurred during the testimony of Officer Don Windham, a Missouri Highway Patrol sergeant responsible for the collection of evidence at crime scenes and the officer who recovered the disputed hairs from the victims' home. During cross-examination, defense counsel attempted to question Officer Windham about the disputed hairs, at which point the prosecutor objected, stating, "There has been no connection of the hair evidence in any of this to any individuals connected in this case." Though the majority views this single statement as an

"admission" by the State that the hairs were tested against and deemed to exclude both appellant and the victims, a more plausible reading of the statement—and one that is consistent with the trial court's ultimate ruling—is that the prosecutor was merely stating that the hair evidence was not connected to anyone involved in the case because the hairs were not tested against anyone but appellant. That the prosecutor did not intend to imply that the hairs had been tested against and determined to exclude the victims is supported by the parties' subsequent treatment of the issue.

In that regard, the issue next arose during defense counsel's offer of proof of testimony by Officer William Randle, a qualified hair expert examiner and the technician who conducted the laboratory tests on the disputed hairs. Officer Randle stated that he tested the hairs found on Candy's leg and on the rope used to tie Irene against hair samples belonging to appellant. At no point, however, did Officer Randle state that the disputed hairs had been tested against samples belonging to the victims, and his lab reports—admitted as part of the offer—likewise give no indication that the disputed hairs, unlike other hairs found at the crime scene, were tested against hair samples belonging to the victims. In fact, in his report, Officer Randle concluded that the disputed hairs only excluded appellant.

Finally, in his Motion for Judgment of Acquittal/New Trial, appellant again raised the issue of the excluded hairs, stating that had he been allowed to present the hair evidence to the jury he would have argued that the hairs did not belong to appellant and, therefore, had to belong to either the victims or the unidentified killer. Thus, appellant, himself, acknowledges in his mo-

tion that the hairs had only been tested against and determined to exclude appellant, not the victims.

In view of those portions of the record that the majority chooses to ignore, the excluded hairs cannot be deemed logically relevant to any issue in this case. The hairs may well have come from the victims themselves, or even from their dog.[1] But because the hairs were tested against appellant only, and were shown to exclude appellant only, the evidence proves nothing more than that appellant did not leave his hair on Candy's leg or Irene's rope. There is no exculpatory value to that evidence. Absent testing that would exclude the victims (and their dog), the evidence does not suggest the presence of a third party at the crime scene. For that reason, the evidence in no way "tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tisius,* 92 S.W.3d at 760. Therefore, the hair evidence was not logically relevant.

With no logical relevance, the hair evidence can have no legal relevance either, for evidence is legally relevant only if its probative value (logical relevance) outweighs the costs associated with its admission, *e.g.,* unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. *State v. Anderson,* 76 S.W.3d 275, 276 (Mo. banc 2002). Here, even assuming that the hair evidence had some minimal probative value because it excluded the appellant, that value would have been outweighed by the risk that the jury would have been confused and misled by the evidence, in view of what the evidence did not exclude. The jury would have been left with hair evi-

---

1. According to the record, the victims owned a dog that was present during the murders. It is therefore possible, if not likely, that the hairs were animal, not human, in origin.

dence that excluded appellant, may or may not have belonged to either or both of the victims, may or may not have been human, and may or may not have belonged to some unknown phantom killer. The hair evidence, then, is a red herring that is confusing and misleading. On the one hand, the jury would be confronted with evidence deemed by the court to be relevant and admissible, but on the other hand, there would be no way for the jury to comprehend the significance of the evidence. Under these circumstances, the trial court's refusal to admit the evidence at trial was not error.

## II.

Assuming arguendo that the trial court erred in failing to admit the hair evidence, in light of the overwhelming evidence of appellant's guilt, a reasonable probability that the error would have affected the outcome of the trial does not exist. *See State v. Rutter*, 93 S.W.3d 714, 728 (Mo. banc 2002); *State v. Johnston*, 957 S.W.2d 734, 744 (Mo. banc 1997); *State v. Cook*, 628 S.W.2d 657 (Mo. banc 1982).

In addressing the prejudice issue, the majority summarizes the State's evidence in a single paragraph and dismisses it as "not overwhelming." In my view, that conclusion cannot be supported given the fact of defendant's confession and the wealth of corroborative evidence. To recount that evidence in the same way as my dissent in the reversal of the first trial, I borrow from the points in the state's brief—points that are amply supported by the record:

* Evidence directly corroborating factual details in appellant's confession, including (1) the bank teller who cashed a check for a man in the company of Candy Sisk and driving a car identical in make, model and color to that driven by appellant, (2) the partially filled-out check found at the murder scene, (3) the man who saw Irene in the backseat of a light-colored car near the bank two days before learning about the murders, [and (4) the absence of fingerprints and semen at the crime scene];

* Appellant's statement that his motive for going to the Sisks' residence was to take money and to get out of town because of his fear that he would not pass a urine test, corroborated by (1) the evidence above, (2) by the fact that the victims' purses had been ransacked and (3) by the fact that after confessing to Officer Hinesly he observed that "the ironic thing" about his situation was that he had since learned that he probably wouldn't have to go back to jail for "just failing one piss test";

* Evidence suggesting that animus against Shirley Niswonger, Candy's mother, may have been a possible motive for murdering the Sisks, including the fact that Niswonger had told appellant several months before the murder that she wanted to break up with appellant and that she was disturbed by a letter he wrote approximately a month before the murders and

* The fact that appellant had made repeated attempts to visit the Sisks the day before the murder, and his statement to Samantha Simmons that he was going to Tallapoosa because someone "owed him some money";

* The fact that a car fitting the description of the one driven by appellant was seen driving slowly in front of the Sisk residence less than three hours before the victims' bodies were discovered;

* The fact that the man who came to the Sisk house a short time later told Irene Sisk that he had "a Christmas gift for Candy from her mother in jail," given that appellant was acquainted with

Candy and had personal knowledge that her mother was incarcerated;

* The fact that this man drove a car of the same make, model and color as that driven by appellant;

* The presence of a number of blood spots and traces on the automobile that had been driven by appellant and that was found at appellant's residence, and the fact that one of these blood samples was determined by DNA analysis to be consistent with a mixture of Irene Sisk's blood and that of another;

* The fact that a microscopic analysis of the numerous ropes found at appellant's residence established that two of them were consistent in color, composition and construction with the ropes that had been used to bind the victims;

* The discovery of notes in appellant's room listing the name "Candace," giving directions to the Sisk house, and describing preparations to be made for entry, including a gun, handcuffs and a rope, corroborated by appellant's possession of handcuffs and rope and the use of rope to bind the victims;

* The fact that appellant told a friend the day before the murder that he had no money, contrasted with his multiple expenditures beginning only a few hours after the killings;

* Appellant's display of a consciousness of guilt by checking into a motel, and appearing a "little edgy" while doing so instead of going to his home in the same city, a short time after the murders, and his telling of multiple inconsistent stories when questioned by police;

* Appellant's possession or disposition shortly after the murders of numerous items that were consistent with having been fruits or instrumentalities of the crime, including a VCR, telephones, a videotape of "Independence Day."

Despite this corroborating evidence, the majority discredits appellant's confession on the basis that it was not taped and was received into evidence at trial "only through an officer's testimony," as if this fact makes the accuracy and voluntariness of the confession immediately suspect. By contrast, I reject the tacit suggestion that the police officer's sworn testimony is not worthy of the credibility determination made by the jury that heard the testimony. After all, defense counsel cross-examined the officer at length regarding the procedures used during defendant's interrogation. In any event, the corroboration evidence is of the strongest sort, and arguably, is alone sufficient to support the conviction.

For these reasons, I would affirm the conviction.

DUANE BENTON, Judge, dissenting.

I dissent. While I agree with the majority's analysis of "Error," I concur in Part II of the Chief Justice's dissenting opinion.