

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD77663** |
| | ) | |
| v. | ) | **OPINION FILED:  May 31, 2016** |
| | ) | |
| **REGINALD L. SINGLETARY JR.,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri**
The Honorable R. Michael Wagner, Judge

Before Division One:  Lisa White Hardwick, Presiding Judge, Thomas H. Newton, Judge
and Cynthia L. Martin, Judge

Reginald Singletary, Jr. ("Singletary") appeals his convictions of first degree murder and armed criminal action following a jury trial.  He claims the trial court erred in excluding testimony offered by three witnesses, in overruling a *Batson*[1] challenge to the State's peremptory strike of venire person number 32, and in refusing to select a jury from outside the Seventeenth Judicial Circuit.  Finding no error, we affirm.

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

## Factual and Procedural Background

Blaine Whitworth ("Whitworth") was murdered on Saturday, September 1, 2012, when he was shot three times outside his home in Warrensburg. Singletary does not challenge the sufficiency of the evidence to support his conviction of first degree murder and armed criminal action in connection with Whitworth's death. We view the evidence in the light most favorable to the verdict.[2]

Whitworth owned two bars in Warrensburg. Singletary had worked as a bouncer in one of the bars until a few weeks before Whitworth's murder.

On the day of the murder, Singletary called his ex-wife, Mellissia Robinson ("Robinson"), and arranged to meet her at around noon at the junction of I-70 and Highway 65. Because Singletary had recently missed a scheduled visitation, Robinson brought the couple's children to the meeting. Singletary was upset with Robinson for doing so, and had her follow him in her car to park behind an old fireworks stand. Singletary made Robinson turn off her cell phone and remove the battery. He proceeded to tell Robinson that he was in a lot of trouble, as he had gotten mixed up with the wrong people and had been asked to kill a man. Singletary told Robinson that he had to do so that night or his family would be killed. Singletary showed Robinson a black handgun, and claimed it had been given to him by the people who wanted him to kill the man. Singletary claimed he could not go to the police because they were "dirty." He told

---

[2]*State v. Jones*, 479 S.W.3d 100, 105 (Mo. banc 2016) (recognizing that the evidence in a criminal case is viewed to determine its sufficiency to support a verdict in the light most favorable to the verdict).

2

Robinson that if she did not hear from him, she and the kids needed to disappear and change their names. Singletary hugged his family and then left.

Whitworth went to one of his bars that night around 7:00 p.m. As was his habit, Whitworth spent about an hour at the bar, and then left around 8:00 or 8:30 p.m. Ordinarily, Whitworth would return later in the evening to tend bar. However, he did not return to the bar that evening. Instead, some time prior to 9:30 p.m., Singletary parked down the street from Whitworth's house. After Whitworth arrived home, Singletary exited his car and approached and shot Whitworth three times with a .40-caliber Smith and Wesson Hi-Point JCP Holloway handgun. Singletary then fled the scene.

Police were called to the scene on a report of shots fired. They saw Whitworth lying motionless on the ground outside his truck. He was deceased. In processing the scene, a bullet hole was found in the rear passenger door of Whitworth's truck. A cash register drawer and bank bag, both full of money, and a laptop computer were found in the truck. A shell casing was recovered from the yard the next day.

After the meeting with Singletary, Robinson had decided to stay with a friend in Sedalia. At around 8:00 p.m., she reported her conversation with Singletary to the Sedalia police. Detective Jill Green ("Detective Green") met with Robinson to discuss the situation. During that meeting, Robinson received a call from Singletary saying "I will be there to open gifts. Don't worry. Everything is taken care of." When Robinson

asked what Singletary meant, he said he would be there on Monday and that everything was taken care of.[3]

The next day, Singletary called Robinson at about noon. He asked her to call him back on a land line. Singletary then told Robinson that he needed her to say that he had been with her and the kids the previous day. Though reluctant to do so, Robinson agreed. Singletary called Robinson back a few minutes later telling her that she needed to say he had been with her and the kids from 2:00 p.m. to 8:00 p.m. the day before.

After talking to Singletary, Robinson and her friend searched the computer for information about murders in the Kansas City area. Robinson learned there had been a murder the night before in Warrensburg, and was concerned that Singletary was involved because he had recently worked as a bouncer in Warrensburg. She contacted Detective Green with the Sedalia Police Department who put Robinson in touch with the Warrensburg police.

On Tuesday, September 4, Singletary and Robinson met outside a McDonald's in Sedalia. Robinson asked Singletary if she and the kids were safe and if Singletary had anything to do with the man killed in Warrensburg. Singletary responded, "Let's just say I found another way to have it done. Taken care of." He admitted that he had a "major part" in it, and that he did it to protect his family from "these people." Singletary told Robinson that everything was fine and again told her to say that he had been with her from 2:00 p.m. to 8:00 p.m. on September 1. Singletary also told Robinson that he had an alibi starting between 10:00 and 10:30 p.m. Robinson then told Singletary she was

---

[3]A birthday party was scheduled for one of the couple's children on that day.

4

going in to the restaurant to buy food for the kids, and to meet them at a nearby park. When Singletary got to his car, he was arrested.

Singletary was interviewed by the police. For the first half of the interview, Singletary would not answer questions, but kept asking questions to try to get information. Singletary repeatedly said that his life was over and that he was "done." He claimed that a group of people with power and money had threatened to kill him and his family. Later in the interview, he told the police that he had provided the gun for the murder and was at the scene of the murder to take evidence from the gunman. Later still in the interview, Singletary claimed that the other man did not show up, so he committed the murder.

Singletary told police during the interview that his roommate, Ziyad Abid ("Abid"), was connected to a group of criminals in Kansas City and wanted to buy Whitworth's bars. Singletary claimed that he had spoken to Whitworth about selling the bars to Abid, but that Whitworth did not believe Abid had the money to buy the bars. Singletary told police that Abid pressured him into agreeing to seriously injure or kill Whitworth by framing him for a residential burglary and by threatening Singletary's life and the lives of his family members. Throughout the interview, the police discounted Singletary's concerns about Abid, and characterized Abid as a "fake."

At one point in the interview, Singletary told the police that he buried the gun used to murder Whitworth at a commuter parking lot at the junction of Highways 7 and 13 in Higginsville. By phone, Singletary directed an officer to the exact location where the gun was recovered. Subsequent tests established that the spent shell casing found in

5

Whitworth's yard had been fired from the gun, and that the bullets recovered from Whitworth's body were consistent with having been fired from the gun.

At trial, Singletary's police interview was introduced into evidence and played for the jury.[4] Singletary testified in his own defense, and claimed that he was framed for Whitworth's murder by Abid and his associates and that he had falsely confessed to the murder in order to protect his family from Abid.

The jury convicted Singletary of first degree murder and armed criminal action. Singletary was sentenced to consecutive terms of life without the possibility of parole for murder and thirty years for armed criminal action. Singletary timely appealed.

**Analysis**

Singletary raises three claims of error. He argues in his first point on appeal that the trial court erroneously sustained the State's objection to admission of the testimony of three witnesses who would have testified about Abid. In his second point, Singletary argues that the trial court erroneously overruled his *Batson* challenge to the State's peremptory strike of venire person number 32. In his third point, Singletary argues that the trial court abused its discretion in refusing to impanel a jury drawn from outside the Seventeenth Judicial Circuit.

**Point One**

The trial court sustained the State's objections to the relevancy of testimony offered by Singletary from three witnesses, and in each case, Singletary made an offer of

---

[4]Portions of the interview were played for the jury during the State's case-in-chief. The entire interview was played for the jury during Singletary's case-in chief.

6

proof. Officer Kevin Bundy ("Officer Bundy") would have testified that Abid had a wallet in his possession at the time of his arrest[5] that was designed to carry a police badge. Daniel Tuiono ("Tuiono") would have testified that Abid once asked him to beat up another person. Racheal McCurley ("McCurley") would have testified that she once lived with Abid, and that Abid frequently had information about the private contents of her cell phone.

In response to the State's relevancy objections, Singletary argued the testimony of these three witnesses was relevant to establish Singletary's state of mind during the police interview when he confessed to murdering Whitworth. Because the police kept telling Singletary during the interview that Abid was not a real threat, Singletary argued the testimony established that Abid was a threat and supported his claim that he falsely confessed to Whitworth's murder out of fear of Abid. At the same time, however, Singletary made it clear to the trial court that he was not claiming that his statements to the police were made involuntarily or that he murdered Whitworth under duress.

A trial court is vested with broad discretion to determine whether to admit evidence at trial, and its rulings will not be disturbed on appeal unless they constitute an abuse of discretion. *State v. Johnson*, 207 S.W.3d 24, 42 (Mo. banc 2006). An abuse of discretion requires a trial court's ruling to be clearly against the logic of the circumstances and so arbitrary and unreasonable as to indicate a lack of careful consideration. *Id.* at 40. "A rebuttable presumption of prejudice is created when admissible evidence is

_____

[5]Abid was arrested in connection with Whitworth's murder but was later released.

improperly excluded in a criminal case." *State v. Sanders*, 126 S.W.3d 5, 23 (Mo. App. W.D. 2003) (citing *State v. Barriner*, 111 S.W.3d 396, 401 (Mo. banc 2003)).

To be admissible, evidence must first be logically relevant. *State v. Davis*, 318 S.W.3d 618, 639 (Mo. banc 2010). Logical relevance refers to evidence which tends to make the existence of a fact of consequence more or less probable, or which tends to corroborate other relevant evidence bearing on a principal issue in a case. *Id.* at 639-40.

Singletary claims that the excluded testimony of Officer Bundy, Tuiono, and McCurley was logically relevant because it tended to prove his state of mind and his motivation for falsely confessing to Whitworth's murder. We disagree. Singletary's offers of proof did not establish that Singletary knew that Abid carried a wallet of the type used to hold a police badge, that Abid had asked Tuiono to hurt another person, or that McCurley suspected that Abid had suspicious access to the contents of her phone. In the absence of evidence that Singletary was aware of the subject matter of the excluded testimony at the time of his police interview, the excluded testimony was not logically relevant to establish Singletary's state of mind during his police interview.

Singletary's reliance on *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45 (Mo. banc 2006), is unavailing. In *Vincent*, the Missouri Supreme Court held that it was error to exclude evidence that police falsely told an accused that she failed a lie detector test she actually passed, where the evidence had been offered by the accused to explain her confession. *Id.* at 49-50. The Court concluded that the evidence was admissible under the "rule of completeness" because it was evidence "of the circumstances of a writing, statement, conversation, or deposition [permitting] the jury [to] have a complete picture

8

of the contested evidence." *Id.* *Vincent* is easily distinguished. Unlike the plainly false statement made by the police in *Vincent*, the excluded testimony in this case was not related to circumstances attendant to Singletary's statements to the police, as the subject matter of the testimony was not known to police or raised by the police during the interview.

In his Brief, Singletary makes the additional argument that the excluded testimony proved that others had reason to be suspicious or fearful of Abid. However, Singletary did not offer the excluded testimony for this purpose at trial. And we are not persuaded that the excluded testimony would have been logically relevant if offered for this purpose. The relevant fact in consequence for the jury to decide was whether Singletary's fear of Abid caused him to falsely confess to murdering Whitworth. The opinion held by others about Abid does not tend to prove or disprove that Singletary was afraid of Abid or that he falsely confessed to Whitworth's murder.

The trial court did not abuse its discretion in sustaining the State's relevancy objections to the admission of testimony from Officer Bundy, Tuiono, or McCurley regarding Abid. Point one is denied.

**Point Two**

In his second point on appeal, Singletary argues that the trial court erroneously overruled his *Batson* challenge to the State's peremptory strike of venire person number 32. Singletary argues that the State's expressed reason for striking venire person number 32--because she was involved in pending civil litigation--was not logically related to

9

Singletary's criminal case and was pretextual because the strike was inaccurately justified by a claim that other similarly situated venire persons had been stricken.

The State is constitutionally prohibited from using peremptory challenges to strike potential jurors based solely on discriminatory criterion. *Batson v. Kentucky*, 476 U.S. 79 (1986). However, a trial judge is vested with considerable discretion in determining whether the State's rationale for a peremptory strike is not discriminatory. *State v. Gray*, 887 S.W.2d 369, 384 (Mo. banc 1994). We will not reverse a trial court's determination about whether a peremptory strike is discriminatorily motivated unless the decision is clearly erroneous. *Id.*

To properly raise a *Batson* challenge, a defendant must first specifically object to the State's strike of a venire person by identifying the discriminatory criterion purportedly relied on to make the strike. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). Here, that did not occur. After the State announced its peremptory strikes, Singletary stated as follows:

> We have received the State's strike list and that includes Juror Number 32, and I am making a *Batson* challenge.

Singletary never identified the discriminatory criterion he alleged the State had relied on to strike venire person number 32. Arguably, Singletary thus failed to preserve his *Batson* challenge.

It appears from the transcript, however, that the State and the trial court understood Singletary's *Batson* challenge to have been based on race, though that specific claim was not expressed. We thus treat Singletary's *Batson* challenge as preserved.

10

Once a *Batson* challenge based on race is properly invoked, the burden shifts to the State to provide a race-neutral reason for the strike that is more than an unsubstantiated denial of discriminatory purpose. *Parker*, 836 S.W.2d at 939. Here, in response to Singletary's *Batson* challenge, the State advised:

> The State struck Number 32 in response to questioning is there anybody here currently involved in a pending action. She raised her hand. She is involved in a pending civil action, and I think she used the word "suer." Having used that word, she is currently involved in a pending civil litigation, and at this point, judge, all of the other folks that had mentioned at all that they were involved in either civil litigation or criminal litigation has [sic] been struck. So that is the reason the State is striking Juror Number 32.

Once the State articulated a race-neutral basis for the strike, the burden shifted back to Singletary to show that the State's explanation for the strike of venire person number 32 was pretextual. *Parker*, 836 S.W.2d at 939. Singletary responded to the State's explanation as follows:

> I believe that the follow-up question was she could be fair and impartial as well based upon that, so I believe there is no cause there that the State has announced. They just stated she made that statement and then she said she could be fair and impartial.

Singletary's response to the State's explanation for striking venire person number 32 did not establish that the explanation was pretextual. Rather, the response confused a strike for cause with a peremptory strike. The trial court so noted:

> They are peremptory strikes. I believe it's a race neutral reason. These are the factors that I look at, it's race neutral. It's related to the case. It was clear and specific, which I believe it was, and legitimate, and so I don't believe the State acted with any illegal discriminatory motive. It sounds like they struck other people for the same reason for having lawsuits or a legal action pending.

11

Singletary did not sustain his burden to demonstrate that the State's expressed race neutral reason for striking venire person number 32 was pretextual.

It is true that *after* the trial court's ruling on his *Batson* challenge, Singletary asked the State to identify who else it had struck based on pending lawsuits. The State advised that it was not obligated to disprove pretext, that it would have to go back over its notes to answer Singletary's question, but that "at least three people involved in pending civil actions and civil litigation" had been similarly struck. The trial court repeated its ruling that it did not believe the strike of venire person number 32 was discriminatory.

On appeal, Singletary argues that the State's explanation for striking venire person number 32 was pretextual because the State inaccurately reported to the trial court that other similarly situated venire persons had been struck. According to Singletary, only one other venire person, number 79, advised of an involvement in pending civil litigation, and by the time peremptory strikes were exercised, that venire person was no longer under consideration, as the final jury was selected from venire persons up through number 55. According to Singletary, only one venire person, number 32, was actually struck because of pending civil litigation.

The record supports an alternative interpretation. Venire person number 79, who reported involvement in litigation, had been stricken for cause before the eligible venire panel was reduced to 55 jurors. Another venire person, number 99, identified herself as a paralegal who worked for "many" civil attorneys. Though venire person number 99 was not stricken for cause, she was effectively stricken because the size of the eligible panel was reduced. Though by the time peremptory strikes were exercised, there were no

12

longer any remaining jurors who were "similarly situated" to venire person number 32, we cannot say that the State's characterization that others similarly situated jurors had been stricken was meaningfully or purposefully inaccurate.

In any event, it was Singletary's burden to show that the State's explanation for the strike of venire person number 32 was pretextual. Singletary had equal access to the responses provided by venire persons during voir dire. If Singletary contested the State's representation that other similarly situated persons had been stricken, it was up to Singletary to make that argument to the trial court--and not to wait to make that argument on appeal.

More to the point, it is plain from the record that the trial court accepted the State's explanation for the strike of venire person number 32 for several other reasons not challenged by Singletary. The trial court expressly found that the stated reason for the strike was race neutral, clear and specific, legitimate, and related to the case. Singletary made no argument to the contrary at trial, and makes no argument to the contrary on appeal.

The trial court's decision that the State's peremptory strike of venire person number 32 was not racially motivated, which was expressly based on several factors other than the State's purportedly mistaken statement that other similarly situated jurors had been stricken, was not clearly erroneous. Point two is denied.

### Point Three

In his third point on appeal, Singletary argues that the trial court erred in overruling his objection to the selection of a jury from residents of Cass County.

13

Singletary claims that he withdrew an application to change venue after reaching an agreement with the State and the trial court that his jury would be selected from outside the Seventeenth Judicial Circuit,[6] and that he later rejected a plea offer from the State and insisted on going to trial in reliance on the agreement.

Singletary was charged in Johnson County on October 9, 2012. Singletary filed an application for change of venue on January 22, 2013, which claimed a right to a change of venue pursuant to Rule 32.02. The application did not allege that Singletary would be unable to receive a fair trial in Johnson County, and alleged only that "the parties agree to the venue change."

Rule 32.02 provides in pertinent part that:

> If the parties file a stipulation agreeing upon the transfer of a criminal proceeding triable by jury to a designated court of competent jurisdiction, the court shall order the criminal proceeding transferred to such court. The stipulation shall be filed not later than ten days after the initial plea is entered. . . . Thereafter, no change of venue or change of judge shall be granted to any party stipulating to the change except as provided in Rule 32.09(c) or Rule 32.10. In lieu of transferring the case to the stipulated county, the court may secure a jury from another county as provided by law.

Singletary's application did not comply with Rule 32.02. First, although the application represents that a change of venue has been agreed upon, the application is not a stipulation signed by both Singletary and the State. Second, even if deemed a stipulation, the application does not identify "a designated court of competent jurisdiction" to which a change of venue has been stipulated. Third, the application was filed more than three months after Singletary entered his initial plea. By the plain language of Rule 32.02,

---

[6]The Seventeenth Judicial Circuit is comprised of two Missouri counties: Johnson and Cass.

14

unless a change of venue stipulation is filed within ten days of the initial plea, the trial court has no power to grant the change of venue *except* as provided in Rule 32.09(c) or 32.10. The application made no reference to either Rule, and neither is relied on by Singletary in this appeal.[7]

Although the application did not afford the trial court the authority to change venue, the trial court nonetheless had the authority pursuant to Rule 32.02 to secure a jury from another county in lieu of changing venue. That is precisely what occurred here. A jury was secured from Cass County.

Singletary now claims that he had understood the jury would be secured from outside the Seventeenth Judicial Circuit. His understanding is not supported by the record. During a January 22, 2013 hearing on Singletary's application for change of venue, the State advised the trial court that it was not opposed to a change of venue even though the stipulation was "after the statutory limit."[8] The State explained that it had also discussed with Singletary's counsel the possibility of leaving the case in Johnson County and bringing in "a jury from somewhere else," but that if Singletary persisted with respect to wanting a change of venue, the State would not oppose sending the case to Cass County. Ultimately, Singletary agreed to withdraw his application, "if we are all in agreement that we can get a jury from another county." The trial court specifically asked

---

[7]Rule 32.09(c) provides that Rules 32.01 through 32.09 do not "prohibit a judge from ordering a change of venue or change of judge when fundamental fairness so requires or pursuant to Rule 32.10." Singletary's application for change of venue did not allege that fundamental fairness required a change of venue. Rule 32.10 addresses the right to a change of judge and is not at issue in this case.

[8]An official transcript from the January 22, 2013 hearing was not provided as a part of the record on appeal. However, a copy of the hearing transcript is attached as an exhibit to Singletary's March 17, 2014 application to reconsider jury panel selection location. [L.F. 27-34]

the parties if they had discussed which county. The State responded that no agreement had been reached on that subject. Singletary's counsel agreed. Although there was some discussion about the possibility that the jury could be drawn from a county other than Cass, no agreement was reached on that point. In fact, the trial court expressly stated, "we will plan on bringing a jury in from another county yet to be determined." Singletary's contention on appeal that he withdrew his application for change of venue because an agreement was reached to select a jury from outside the Seventeenth Judicial Circuit is not supported by the record.

Singletary concedes that venire persons who had knowledge of Whitworth's murder, and who had formed an opinion about his case, were removed from the venire panel. [Appellant's Brief, p. 63] Singletary concedes that he was not "subjected to a biased and partial jury." [Appellant's Brief, p. 63] Singletary claims only that he was deprived of the benefit of an agreement that was never reached, and that he made a strategic decision to refuse a plea offer in reliance on an agreement that was never reached. Point three is denied.

## Conclusion

The trial court's judgment is affirmed.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur

16