**STATE of Missouri, Respondent,**

v.

**David L. SANDERS, Appellant.**

No. WD 61432.

Missouri Court of Appeals,
Western District.

Dec. 2, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 27, 2004.

Application for Transfer Denied
Feb. 24, 2004.

Nancy A. McKerrow, State Public Defender Office, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, John Munson Morris, Stephanie Morrell, Office of Attorney General, Jefferson City, for respondent.

RONALD R. HOLLIGER, Judge.

David Sanders was charged with two counts of statutory sodomy in the first degree, Section 566.062, RSMo,[1] and one count of promoting child pornography in the first degree, Section 573.025, RSMo, involving his daughter. Following a change of venue from Saline County, a Lafayette County jury found him guilty on all three counts and recommended the maximum punishment authorized for each offense. The trial court accepted the jury's recommendations and sentenced Appellant to two terms of life imprisonment on the statutory sodomy convictions and a term of fifteen years of imprisonment on the conviction for promoting child pornography. He now appeals, assigning two points of error. He first contends that the trial court erred in admitting the video evidence of the child victim and her video deposition because there was insufficient evidence to admit the hearsay testimony under Chapter 491 and he was therefore denied his right to confront his accusers. In his second point he contends that the trial court erred in excluding certain evidence intended to show that his ex-wife may have taken the pornographic pictures of their daughter. We affirm the sodomy convictions and reverse and remand the child pornography conviction for a new trial.

The following facts supporting the jury's

1. Unless otherwise noted, all statutory references are to RSMo 1994, as that was the law in effect at the time the charged offenses were alleged to have been committed.

verdicts were established at trial.[2] The victim ("R.S.") and her siblings were the children of Appellant and his ex-wife, Michelle Sanders ("Michelle"). Appellant lived in a renovated bank building in Napton, while Michelle and the children lived in Sedalia. One or more of the children would routinely have scheduled visitation with him on the second and fourth weekends of each month. During such overnight visits, they would sleep on mattresses lying on the floor, all in one downstairs room. The children usually slept three to a mattress, and Mr. Sanders would usually sleep with them in the same downstairs room.

When they were staying at Michelle's home, R.S. and one of her sisters, Autumn Sanders ("Autumn"), slept in the same bedroom. In early May 2000, Autumn, who was then fourteen years old, noticed that R.S., then four years of age, was having repeated nightmares and coming to sleep with Autumn in Autumn's bed. R.S. would wake up crying and screaming, saying things like "No, Daddy, no, leave me alone" and "Daddy's eating me." Autumn told Michelle about the nightmares R.S. was having. One day, shortly after an overnight visit to Appellant's home, Michelle sat down with Autumn and R.S. and asked R.S. why she was having nightmares. R.S. told Autumn and Michelle that she was scared, explaining that when she visited Appellant, he pulled down her pants and took "funny pictures" of her.

The next visitation period with appellant was scheduled for the Memorial Day weekend (May 29–30, 2000), which was approximately two weeks away. Michelle asked Autumn to make the trip to Napton that weekend and to look around appellant's house for "anything peculiar," including the photographs R.S. had mentioned. While visiting at his home during the Memorial Day weekend, Autumn looked around the house but did not find anything unusual. Autumn reported her lack of success to Michelle but was told to keep looking. Shortly after talking to her mother, Autumn went upstairs to use the bathroom. While in the bathroom, she noticed that a shelf that was normally uncluttered seemed to be disorganized, with several items shoved underneath it. When Autumn moved around some of the stuff on the shelf, she noticed a tray. She pulled out the tray and saw a Polaroid camera, along with a Ziploc bag containing several rubber gloves, a pair of R.S.'s underwear, and ten explicit Polaroid photographs of R.S. in various states of undress, depicting sexual conduct.[3]

Autumn called Michelle to report these findings, and was told to put the Ziploc bag back where she had found it. Michelle picked up the children the next day, and drove them back to her home in Sedalia. The day after that, Michelle drove Autumn and several of the children back to the father's home in Napton so Autumn could surreptitiously retrieve the bag and its contents. Using the pretense that she

---

2. For the purpose of clarifying the factual summary which follows, it suffices to note that the gist of the two statutory sodomy charges submitted to the jury was that appellant engaged in two separate acts of deviate sexual intercourse with one of his daughters, a child less than twelve years old, by (1) placing his mouth on the child's genitals; and (2) placing his penis in the child's mouth. The gravamen of the promoting child pornography charge submitted to the jury was that

appellant, knowing of their content and character, took photographs of the same daughter, a child less than eighteen years old, which depicted sexual conduct.

3. Other photographs were also found in the bag but the jury was not apprised of this fact, which will be central to the analysis of Sanders' second point on appeal.

had forgotten her bathing suit, Autumn was able to retrieve the items without making her father suspicious.

Michelle and Autumn then proceeded to the sheriff's office in Marshall, where they talked to Saline County Deputy Sheriff Brad O'Neal. Michelle informed O'Neal that she was concerned about some inappropriate activity with her children, and Autumn gave him the bag she had found in appellant's bathroom. After viewing the photographs, O'Neal reported the information he had received to the Saline County Division of Family Services ("DFS").

Officer O'Neal also obtained a warrant to search appellant's home. O'Neal, accompanied by three other police officers, traveled to Napton to execute the warrant. During the ensuing search, the officers found a Polaroid camera underneath a shelf in the upstairs bathroom. In the front room downstairs, they found a mattress and blanket that appeared to be the same as those shown in the photographs of R.S. The officers also discovered a ballpoint pen that appeared to be the same one shown sticking out from between her buttocks in one of the photographs. Saline County Deputy Sheriff Richard Miller then requested and obtained consent from appellant's employer to search the truck driven by Sanders during the course of his employment. Miller found a pair of R.S.' underwear under the mattress in the truck's sleeper compartment.

After Mr. Sanders' arrest, DFS placed R.S. and her siblings in foster care, where they would remain for the next seven months.[4] Cynthia Kneibert, an experienced licensed clinical social worker with a master's degree in counseling who was working under contract with DFS, began providing therapy and counseling services for R.S., her siblings, and her mother in July 2000. Over the course of the six months she was under her care, Kneibert conducted twenty individual 50-minute therapy sessions with R.S., who was then five years old. During the first session, less than two months after appellant's arrest, R.S. told Kneibert that appellant "took flash pictures of [her] private parts" after slipping off her clothes. Gesturing down to her anal area, R.S. also told Kneibert that appellant "stuck a pen in [her] butt." R.S. further related to Kneibert that she had dreams in which appellant tried to kill her and her family and ate her "as a werewolf would." After having these nightmares, R.S. would wake up crying out, "get away from me, get away from me."

In the fall of 2000, Kneibert became aware that R.S. was experiencing rectal bleeding, caused by an internal unhealed tear or fissure of the anus, as well as vaginal itching. R.S. was also developing a "binge and purge"-type eating disorder, unusual for children her age, in which binge eating was followed by self-induced vomiting. During subsequent therapy and counseling sessions, which continued through early January 2001, R.S. again told Kneibert that appellant had "dropped a sharp pen into [her] butt," pulled her pants down and taken pictures of her, and told her that "he was going to cut [her] boobs off." During one of their final counseling sessions together, R.S. told Kneibert about an event that happened while her mother was at work and appellant was baby-sitting the children. She pointed to her crotch area and told Kneibert that appellant made her suck "down there,"

---

4. The children were not placed in Michelle Sanders' custody, evidently because at that point R.S.' brother had made an allegation that his mother had taken similar pictures of him. Again, the jury was not aware of this fact, which is also related to the second point on appeal.

demonstrating how he pushed her head down on his genitals and explaining that she eventually "felt little drops dropping in [her] mouth."

At the request of DFS, in January 2001, Maria Mittelhauser, a Deputy Juvenile Officer for Pettis and Cooper counties, with nearly ten years of experience interviewing children in suspected sex crime cases, conducted an interview with R.S. at her elementary school in Sedalia. During that interview, R.S. told Mittelhauser that her father had taken some pictures of her while she was naked. R.S. further stated that on one occasion, she saw that he had taken some pictures of her seven-year-old brother, S.S., with his pants down. Appellant told R.S., "The same thing happened to you." R.S. also told Mittelhauser that her father made her suck his "nuts" and his penis, physically demonstrating how he placed his hands behind her head and moved it forward and backward during the acts. R.S. went on to describe an incident in which she woke up to find father "down there and sucking her," pointing to her genital region. Finally, R.S. disclosed to Mittelhauser that her father had put grapes "inside her," again pointing to her genital area, after which he sucked them out.

Mittelhauser then terminated the interview and told R.S. that she would like to meet with R.S. at another time. They met again in February 2001, this time at the Sedalia offices of Child Safe of Central Missouri, a children's advocacy center where suspected victims of sexual or physical abuse are interviewed in a safe, non-threatening environment. This interview, which was conducted in a specially designed room containing concealed video cameras and microphones, was recorded on videotape. During the interview, R.S. told Mittelhauser that her father had taken pictures of her naked and that the same thing happened to her brother S.S. R.S. demonstrated how her father made her get down on all fours and used her "bottom" as a sort of table, eating food directly out of her bottom using only his mouth. R.S. also stated that he made her have sex with him by sucking her "private part" and her nipples, and related that he had "dropped" a pen into her "bottom." The jury viewed a videotape of the interview.

During a videotaped in-camera deposition conducted a few weeks before trial, R.S., who was then six years old, testified that a "sharp, sharp" ballpoint pen "fell out of [Appellant's] hand" into her butt and that he took a picture of the pen protruding from her anus. R.S. also testified that on another occasion, her father put pizza and grapes on her "behind" and then ate it off her. Finally, R.S. testified that he licked her butt, sucked on her nipples and tried to take off her nightgown as part of a failed attempt to have sex with her, but she told him to get off. The jury also viewed the videotaped deposition.

Because she was found to be legally unavailable as a witness under Chapter 491, R.S. did not testify in person at trial. Appellant called only one witness, his ex-wife Michelle. Insofar as it aided the State, Michelle's testimony was that during the several weeks preceding R.S.'s last trip to the father's home on Memorial Day weekend, Michelle observed on more than one occasion that R.S. was having nightmares and was waking up during the night crying or screaming. R.S. told Michelle that in those "bad dreams," her father was trying to kill and eat R.S. Michelle also testified that R.S. had told her that her father took some nude pictures of R.S. while R.S. was in bed.

Mr. Sanders' defense to the statutory sodomy charges was that they were the product of coaching and leading questions posed by his ex-wife and those who inter-

viewed R.S. during the investigation, which caused R.S. to tell lies about having been sodomized by him. His defense to the promoting child pornography charge was that Michelle or Autumn planted the photographs in his residence and then influenced R.S. to lie about who took them and where they came from. Additional facts are provided, when required, to analyze Appellant's two points relied on.

### The Admission of R.S.' Hearsay Testimony under Sections 491.075.1 and 491.680

In his first point, appellant argues that the trial court erred in (1) admitting the testimony from Autumn, Mittelhauser, and Kneibert regarding R.S.' out-of-court statements to them; (2) allowing the jury to view the videotaped interview of R.S. by Mittelhauser; and (3) allowing the jury to view the videotaped in-camera deposition of R.S. because those actions violated his confrontation clause rights in that the evidence was insufficient to support the trial court's pretrial rulings that R.S. was legally unavailable to testify live during his trial.

To facilitate proper review of this point, it is necessary to summarize the procedural history of the issue. Before trial, the State filed a "Motion to Admit Hearsay Statements of Child Under Twelve" requesting leave, pursuant to section 491.075, to introduce as substantive evidence at trial various out-of-court statements made by R.S. to a number of individuals. After conducting an evidentiary hearing in November 2001 during which four witnesses testified on behalf of the State (and none on behalf of appellant), the trial court granted this motion. Specifically, the trial court issued a finding that "the time, content and circumstances of the out-of-court statements provide sufficient indicia of reliability" to qualify them for admission into evidence. It further found that although R.S. was "otherwise physically available as a witness," the "significant emotional or psychological trauma which would result from testifying in the personal presence of the defendant makes [her] unavailable as a witness" at trial.

The State also filed a pretrial "Motion to Order Video Recording of Alleged Child Victim, Excluding Defendant From Proceedings" seeking authorization to conduct, pursuant to Section 491.680, RSMo, an in-camera videotaped deposition of R.S. for use as substantive evidence at trial. This motion further requested that appellant (but not his trial counsel) be excluded from the deposition proceedings. After considering the evidence presented at the November 2001 hearing and receiving testimony from one additional witness for the State in February 2002, the trial court granted that motion as well, finding that "significant emotional or psychological trauma to the child would result from the child testifying in the personal presence of the defendant either at trial or in a deposition, and the child is therefore unavailable as a witness."

On the morning of the day trial was scheduled to begin, trial counsel for appellant subpoenaed R.S. and requested that the trial court reconsider, in light of her performance during the deposition proceeding, its previous ruling that she was unavailable to testify at trial. In conjunction with this request, counsel for appellant asked the trial court to review the videotape of R.S.' deposition testimony. The trial court declined to view the videotape and granted the State's motion to quash the subpoena, reasoning that it had previously "heard evidence on multiple occasions concerning the propriety of requiring [R.S.] to testify and the appropriate environment for her testimony" and noting that the purpose of those prior hearings

"would be defeated by allowing [the] subpoena to stand." Counsel for Sanders unsuccessfully renewed his objections to the admission of R.S.'s videotaped deposition and out-of-court statements several times during trial, and assigned their denial as error in his motion for new trial.

Section 491.075.1 provides:

A statement made by a child under the age of twelve relating to an offense under chapters 565, 566 or 568, RSMo, performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability;[5] and

(2)(a) The child testifies at the proceedings; or

(2)(b) The child is unavailable as a witness; or

(2)(c) The child is otherwise physically available as a witness but the court finds that the significant emotional or psychological trauma which would result from testifying in the personal presence of the defendant makes the child unavailable as a witness at the time of the criminal proceeding.

The relevant portions of section 491.680[6] include:

1. In any criminal prosecution under the provisions of chapter 565, 566 or 568, RSMo, involving an alleged child victim, upon the motion of the prosecuting attorney, the court may order that an in-camera videotaped deposition of the testimony of the alleged child victim be made for use as substantive evidence at preliminary hearings and at trial.

2. If the court finds, at a hearing, that significant emotional or psychological trauma to the child which would result from testifying in the personal presence of the defendant exists, which makes the child unavailable as a witness at the time of the preliminary hearing or trial, the court shall order that an in-camera videotaped deposition of the testimony of the alleged child victim be made for use as substantive evidence at the preliminary hearings and at trial. Such recording shall be retained by the prosecuting attorney and shall be admissible in lieu of the child's personal appearance and testimony at preliminary hearings and at trial, conflicting provisions of section 544.270, RSMo, notwithstanding . . .

3. Upon a finding of trauma as provided for in subsection 2 of this statute, the court may also exclude the defendant from the videotape deposition proceedings in which the child is to testify. . . .[7]

**5.** Appellant does not take issue with the trial court's findings on this issue.

**6.** This section is part of the Child Victim Witness Protection Law, §§ 491.675–491.705.

**7.** The first sentence of section 491.685.1 provides that "On motion of the prosecuting attorney, the court may exclude the defendant from any or all deposition proceedings at which the child is to testify." Thus, in contrast to section 491.680.3, section 491.685.1 appears, on its face, to permit the defendant to be excluded from the in-camera deposition proceeding without a showing that testifying in the personal presence of the defendant would result in significant emotional or psychological trauma to the child deponent. However, in *State v. Naucke*, 829 S.W.2d 445 (Mo. banc), *cert. denied*, 506 U.S. 960, 113 S.Ct. 427, 121 L.Ed.2d 348 (1992), the Supreme Court of Missouri indicated that, be-

4. The court shall preside over the depositions, which shall be conducted in accordance with the rules of evidence applicable to criminal cases.

Appellant does not argue that Sections 491.075 and 491.680, RSMo, when properly administered by a trial court, infringe the right of confrontation guaranteed him by Article I, section 18(a) of the Missouri Constitution and the Sixth Amendment to the United States Constitution (which applies to defendants in state criminal prosecutions by incorporation through the Fourteenth Amendment). Instead, he claims he was denied his constitutional right to confront his accusers when the trial court failed to correctly apply them. He particularly argues that 491.075.1(2)(c) and 491.680.2 were violated because the evidence received by the trial court at the pretrial Chapter 491 hearing was insufficient to support its findings that R.S. was an unavailable witness because of significant emotional or psychological trauma that would result from testifying in his personal presence. That being the case, his argument continues, her out-of-court statements and videotaped deposition were inadmissible hearsay and his convictions must be reversed, as they were all predicated entirely on that hearsay evidence.

 Our review of the trial court's decision to admit R.S.' out-of-court statements into evidence under section 491.075 is limited to a determination of whether it amounted to an abuse of discretion. *State v. Redman,* 916 S.W.2d 787, 792 (Mo. banc 1996); *State v. Werneke,* 958 S.W.2d 314, 318 (Mo.App.1997). Although the appellate courts of this state have not previously

had occasion to expressly rule the issue, we think it is clear that the same standard governs our review of the trial court's decision to admit R.S.'s videotaped in-camera deposition under section 491.680. *See, e.g., State v. Benwire,* 98 S.W.3d 618, 625 (Mo.App.2003) ("This court's review of the trial court's decision to admit testimony is limited to whether such decision was an abuse of discretion.") Furthermore, as appellant challenges the sufficiency of the evidence to support the trial court's factual findings on the trauma issue, the evidence is viewed in the light most favorable to the trial court's decision, including all reasonable inferences tending to support them and ignoring all contrary inferences. *State v. Shaw,* 847 S.W.2d 768, 771 (Mo. banc 1993); *see also State v. Rodriguez,* 877 S.W.2d 106, 110 (Mo. banc 1994) (citations omitted) ("The trial court's factual determinations will be sustained unless there is insufficient evidence to support those rulings. On review, the appellate court considers the facts and the reasonable inferences of those facts in [the] light most favorable to the trial court's ruling."); *State v. Costa,* 11 S.W.3d 670, 678-79, 684-85 (Mo.App.1999). Thus, we first consider whether the trial court abused its discretion in finding that R.S. was legally unavailable as a witness as defined in Section 491.075.1(2)(c), RSMo, because of significant emotional or psychological trauma that would result from testifying in the physical presence of her father.

The first witness presented by the State during the Chapter 491 hearing was Robin Pummill, a licensed professional counselor with a master's degree in counselor education who often works with children sus-

fore a defendant is excluded and the deposition can be admitted into evidence, such a showing is required under sections 491.680 *and* 491.685. 829 S.W.2d at 448, 456. *See also State v. Hobbs,* 106 S.W.3d 498 (Mo.App.

2003) (holding that criminal defendants have constitutional due process and confrontation clause rights to be present at evidentiary hearings conducted pursuant to section 491.075.1).

pected to have been sexually abused. Pummill, who conducted at least ten individual counseling sessions with R.S. between mid-January and early November of 2001, was questioned by the State on direct examination as follows:

Q.: Well, first, when is the last time [R.S.] saw her father?

A.: May of 2000.

Q.: And, to your knowledge, has she had any conversations with him between that date and today's date [November 2, 2001]?

A.: No. . . .

Q.: Now, in the course of your conversations with [R.S.], have you formed an opinion as to the advisability of [R.S.] testifying in person in front of a jury and testifying in the presence of her father?

A.: First of all—well, your first question was what type of a child do I feel that she is?

Q.: No. My first question is: Have you formed an opinion as to whether or not—as to the effect it would have on [R.S.] to testify live at trial in front of her father?

A.: Yes, I have.

Q.: And have you also formed an opinion as to the effect it would have on [R.S.] if she testified being physically present in the view of or in the same room as her father?

A.: Yes.

Q.: And what is your opinion? Is your opinion the same in both cases?

A.: Yes.

Q.: And what is that opinion?

A.: My opinion is that it would not be in the best interest of [R.S.] to testify in a courtroom with her dad present and to be able to sit in that type of a situation. And also, being the age

that she is, I do not believe that that would be in the best interest of her.

Q.: Is it your opinion that significant emotional or psychological trauma would result from that sort of a situation?

A.: Yes, I believe that that could occur.

Q.: And how old is [R.S.]?

A.: Six.

Appellant's defense counsel then cross-examined Pummill:

Q.: And the purpose of your being here today was to say that, based on your working with [R.S.], a six-year-old child, that she is not capable of coming in and testifying in front of a jury?

A.: Yes.

Q.: And the basis of that is what?

A.: Because of her age. Also, because she's six years old, and also because I do not believe that it's in the best interest of [R.S.] as my client to be in a position to come into a courtroom, because I believe an environment for a child needs to be safe and a comfort level as much as possible, and when she has not seen her dad since May of 2000, to come—

Q.: All I'm talking about is in front of the jury at this time.

A.: Oh, okay. But, still, to have to come into this type of situation and to have to—to, you know, be in this type—a witness chair. And, as far as having to disclose and share that information, I believe that that would not be, you know, an emotional equal of power for her, so I don't believe it's in her best interest.

Q.: Do you believe that she is capable of communicating the information in any environment; is she old enough

at six that she can communicate and speak?

A.: Yes.

Q.: She is capable of doing that?

A.: Yes.

Q.: Rather, your focus is you don't believe that it would be something that she could endure emotionally—

A.: Yes.

Q.:—to come into a courtroom and tell her story about what happened?

A.: Yes.

Mr. Sanders contends that this testimony indicated only that R.S. should not testify because of her age and the witness' subjective opinion that it was not in the best interest of such a young child to testify in front of the perpetrator.

Michelle Sanders also testified during the November 2001 evidentiary hearing. In early May of 2000, just a few weeks before R.S.' last trip to appellant's home on Memorial Day weekend, she observed that R.S. was having recurring nightmares or "bad dreams" and on several occasions woke up during the night yelling, "No. Stop. Daddy, stop." Michelle testified that R.S. told her about dreams in which appellant was trying to kill R.S., and in which monsters were trying to eat her. When Michelle asked R.S. about the bad dreams and night terrors she was having, R.S. told Michelle that "she didn't like spending overnights" at appellant's house in Napton, and that at times she was afraid to go see him. Finally, R.S. told Michelle that appellant's acts were "bad" and that "she doesn't want to go through that any more." The other two witnesses for the State (Kelli Wald, a DFS worker who interviewed R.S. in late May of 2000, and Maria Mittelhauser) discussed various statements R.S. had made to them concerning the sexual abuse she had suffered, and provided details about the time, content, and circumstances under which those statements were made.

The first and only witness to testify at the continuation of the evidentiary hearing in February 2002 was Cynthia Kneibert, who among other things described how, during a play therapy session, R.S. took a Barbie doll, removed its clothes, sucked on its nipples, and said, "I'm going to bite your boobs off. Daddy told me he was going to bite my boobs off." Kneibert also related how R.S. talked about having a series of "terrible dreams" in which the common theme was "her father eating her, you know, devouring her or stabbing her, or [where] he becomes a werewolf and eats her."

The standard of proof required to support a finding of trauma (and hence, legal unavailability) under both section 491.075.1(2)(c) and section 491.680.2 is the same. *Kierst v. D.D.H,* 965 S.W.2d 932, 941 (Mo.App.1998). There must be some expert testimony that serious emotional or psychological trauma would result if the victim were required to testify in the presence of the defendant unless the distress of the child victim is so evident that the trial court would be competent to determine the issue itself. *Id.* at 941–42. Such evidence need not come from a psychologist, psychiatrist, or physician; testimony by an experienced social worker or other person who is knowledgeable about such issues will suffice. *Id.* at 941. In determining whether the trial court abused its discretion in admitting the out-of-court statements, we must consider whether the evidence was sufficient to support the trial court's rulings on the trauma issue. In so doing, the evidence before the trial court is viewed in the light most favorable to the decision it made.

In support of his claim that the evidence summarized above was insufficient to support the trial court's findings on the trau-

ma issue, appellant cites *Kierst* and *State v. Wideman*, 940 S.W.2d 18 (Mo.App.1997). However, *Kierst* and *Wideman* are of no assistance to appellant. In *Kierst*, the trial court admitted the hearsay statements of the six-year-old victim, who was present and available but did not testify at trial, under section 491.075.1(2)(c). 965 S.W.2d at 939. Without receiving any evidence on the issue, the trial court ruled that the victim was "unavailable" as a witness at trial, based solely on the child's age and its own observations of him from across the courtroom. *Id.* at 940. The trial court made no specific finding that testifying in the presence of the defendant would even affect the child victim, much less that doing so would cause him significant emotional or psychological trauma. *Id.* Moreover, the trial court did not explain what about its observation of the victim led it to conclude that the child should be considered legally unavailable, and did not describe anything about the child, other than his age, to show a basis for its ruling. *Id.* at 940, 942. In *Kierst*, we also discussed *State v. Sanchez*, 752 S.W.2d 319 (Mo. banc 1988), a section 491.680 case in which the defendant's convictions were reversed because no evidence of trauma was presented to the trial court before it excluded the defendant from the in-camera deposition proceedings and admitted the videotaped depositions at trial. We ultimately reversed the defendant's statutory sodomy convictions and remanded for an evidentiary hearing on the trauma issue, holding that "such evidence cannot be provided merely by knowledge of the child's age and the sensitive nature of the subject involved." 965 S.W.2d at 941. Sanders argues that this case, like *Kierst*, involves no expert evidence of unavailability other than age or the child's best interests.

In *Wideman*, the State stipulated that the three-year-old victim was present and available to testify, but elected, under the general unavailability provision of section 491.075.1(2)(b), to use only her out-of-court statements at trial, which were introduced into evidence through several witnesses. 940 S.W.2d at 20. On appeal, the State conceded that the trial court erred in admitting the victim's hearsay statements under section 491.075.1(2)(b), because that statute "is restricted to circumstances in which a child witness is either physically unavailable to testify at trial, or is deemed unavailable due to lack of responsiveness on the witness stand." *Id.; see also State v. Jankiewicz*, 831 S.W.2d 195, 197–98 (Mo. banc 1992) (so interpreting a prior version of Section 491.075.1(2)(b), RSMo). This court reversed the defendant's sodomy conviction and remanded for a new trial, holding that since the trial court made no findings on the trauma issue, the victim's hearsay statements to others could not be admitted under the psychological and emotional trauma provision of Section 491.075.1(2)(c) either. *Wideman*, 940 S.W.2d at 20.[8]

The many important differences between the instant case and those cited by Sanders are evident. Although the case is fairly close, here, the evidence was sufficient to support the trial court's findings that R.S. was legally unavailable as a witness due to the serious emotional or psychological trauma which would result if she were required to testify in the pres-

---

8. To the same effect, see *State v. Davidson*, 764 S.W.2d 731 (Mo.App.1989), in which this court held it was reversible error to admit an in-camera videotaped deposition taken pursuant to section 491.680 when the child victim did not testify at trial, the defendant was excluded from the deposition proceedings, and the State failed to introduce any evidence (and the trial court made no findings) as to the trauma the victim would suffer if required to testify in the presence of the defendant, either during the deposition or at trial.

ence of appellant, both during the video-taped deposition proceeding and at trial. In particular, the trial court did not make its determination based only on its own prior experience and general knowledge, but issued case-specific findings on the trauma issue only after conducting an evidentiary hearing at which five witnesses testified, each of whom was subjected to cross-examination by appellant's trial counsel. Three of those witnesses (Pummill, Mittelhauser, and Kneibert) had extensive expert clinical experience with R.S., and R.S.'s mother Michelle was in an excellent position to observe her distressing behavior at home.

The evidence before the trial court showed that appellant had threatened to bite off R.S.' breasts and that she was fearful of her father. That fear manifested itself in a series of terrible recurring nightmares of him killing and devouring her like a werewolf—nightmares that were so severe she would wake up during the night yelling, "No. Stop. Daddy, stop."

Furthermore, while they might have been stated with more clinical precision, to a greater degree of certainty, or without introducing irrelevant considerations such as the child's "best interest," the expert opinions expressed by Pummill were not based merely on her knowledge of R.S.' age and the sensitive nature of the subject matter, but on several other factors, including the long period of time (eighteen months) which had passed since R.S. had seen appellant after having been removed from his home, the safety and comfort level of her environment, and her inability to endure the relative inequality of emotional power she would experience if forced to disclose and share information about her sexual abuse from the witness chair in appellant's physical presence. Moreover, trial counsel for appellant elicited cross-examination testimony from Pum-

mill that adequately corrected whatever deficiencies may have remained at the conclusion of Pummill's direct examination.

As additional support for his claim that the trial court abused its discretion in admitting the extrajudicial statements of R.S., appellant points to hearing testimony from some of the State's witnesses that R.S. was doing fine socially at school and that during the interviews and therapy sessions they had conducted with R.S., she was "very forthcoming" and did not seem to have any difficulty talking to them about the abuse to which she had been subjected, even though they had never met before and had yet to establish the sort of trust relationship usually needed for a child victim of sexual abuse to begin opening up to a therapist. However, aside from the fact that this testimony was of extremely limited value in helping the trial court determine whether testifying *in the personal presence of appellant* would result in significant emotional or psychological trauma to R.S., the trial court was in no way obliged to credit it, particularly in the way appellant urges. *See State v. Crawford,* 68 S.W.3d 406, 408 (Mo. banc 2002) (when trial court acts as the finder of fact, it may choose to accept or reject "all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.")

■ Next, appellant claims it was error for the trial court to have made its rulings on the trauma issue without having *personally* observed, questioned, or received live testimony from R.S. herself. The only authority he cites for this proposition is an out-of-context snippet from the majority opinion in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), that "personal observation by the judge should be the rule rather than the exception." 497 U.S. at 858, 110 S.Ct.

3157 (describing the holding of the Maryland Court of Appeals in *Wildermuth v. State*, 310 Md. 496, 530 A.2d 275, 289 (1987)). That language appears in the midst of the court's discussion of the Maryland Court of Appeals' interpretation of its prior decision in *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), and did not constitute a part of the Court's actual holding in *Craig*. In any event, the court in *Craig* proceeded to reject the very argument appellant advances, holding that "[a]lthough we think such evidentiary requirements could strengthen the grounds for use of protective measures, we decline to establish, as a matter of federal constitutional law, any such categorical evidentiary prerequisites" governing the manner in which evidentiary hearings are conducted. 497 U.S. at 860, 110 S.Ct. 3157. This court does likewise.

▇▇▇ Finally, appellant argues that it was an abuse of discretion for the trial court not to have viewed the videotape of R.S.' deposition testimony before quashing the subpoena issued to her on the eve of trial. The record shows that although he made some preliminary remarks, the trial judge did not, in fact, preside over R.S.' in-camera videotaped deposition as required by Section 491.680.4, RSMo, but left before she was seated and sworn. It also shows that the trial court declined, on several occasions, to view the videotape or reconsider its prior rulings on the trauma issue after the deposition was conducted. However, the record further reveals the reason

for this: shortly before the deposition began, counsel for both the State and appellant expressly "waived" Section 491.680.4's requirement that the trial court preside over the proceedings. In our view, having affirmatively agreed to conduct the deposition out of the presence of the trial court in the face of a statute requiring the opposite, appellant can hardly be heard to complain on appeal that the trial court's decision not to view the videotape was an abuse of discretion. *See, e.g., State v. Byrd*, 676 S.W.2d 494, 500 (Mo. banc 1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985) ("[A] party may not complain of prejudice which his own conduct creates."); *State v. Copeland*, 95 S.W.3d 196, 202 (Mo.App.2003) ("A party simply cannot lead a court into error, and then employ that error as a source of complaint on appeal.") Moreover, we fail to see how appellant was prejudiced because, as he was excluded from the deposition, the videotape would have been of little or no use in helping the trial court decide the issue of whether testifying in his personal presence would cause significant emotional or psychological trauma to R.S. Therefore, the trial court did not abuse its discretion in refusing to reconsider its previous rulings on the trauma issue in light of R.S.' videotaped deposition testimony.[9]

We conclude that the trial court received sufficient evidence for it to determine that R.S. was legally unavailable to testify, and did not abuse its discretion in admitting her out-of-court statements and videotaped

---

9. In addressing this issue, we do not mean to suggest that it is acceptable for opposing counsel to abrogate section 491.680.4 by mutual agreement, and certainly without expressing persuasive reasons for their agreement. Nor do we endorse the trial court's apparent acquiescence in the use of such a procedure, which has the potential to cause a variety of problems. *See Naucke*, 829 S.W.2d at 452 (observing that the trial court's role in

presiding over § 491.680 depositions is significant because it is one of the "specific features" which enable such proceedings to "approach the equivalent of in-court testimony"). We merely hold that under the circumstances here, the trial court did not abuse its discretion in refusing to view the videotape or to reconsider its prior rulings on the trauma issue after considering its contents.

deposition at trial. Accordingly, appellant's first point is denied.

## Exclusion of Defendant's Evidence

In his second point relied on, Sanders argues that his conviction on the promoting child pornography charge must be reversed since the trial court erred in refusing: (1) to allow him to call R.S.' brother S.S. as a witness at trial, (2) to admit certain explicit photographs of S.S. similar to those of R.S., and (3) to admit portions of a videotaped interview of S.S. conducted by DFS, because the exclusion of that evidence violated his rights to due process and a fair trial. He contends that the evidence was relevant and material to his defense that he had been "set up" by his ex-wife Michelle, who took the explicit photographs of both children and planted them in his home.

As with the first point, it is necessary to present additional facts and to summarize the procedural history of this issue. Appellant was tried and convicted on one count of promoting child pornography in the first degree, Section 573.025.1, RSMo, which provides:

A person commits the crime of promoting child pornography in the first degree if, knowing its content and character, he photographs, films, videotapes, produces, publishes or otherwise creates child pornography, or knowingly causes another to do so.

Accordingly, the relevant portion of the verdict director stated that the defendant would be found guilty of the charged offense if the jury found and believed from the evidence beyond a reasonable doubt that "the defendant photographed certain material consisting of photographs of [R.S.]." [10]

Shortly before trial, the State presented a motion in limine seeking to prevent the defense "from introducing any evidence of" or "asking any questions concerning" anything suggesting "that the victim or any of her siblings was photographed . . . by someone other than the defendant." The trial court granted the State's motion over objection by trial counsel for Sanders.

Although the trial court did not permit the jury to be informed of this fact, the State stipulated that the Ziploc bag retrieved from appellant's upstairs bathroom by Autumn also contained three nude Polaroid photographs of R.S.' brother S.S., each of which depicted his genitals. The State originally charged appellant with a second count of promoting child pornography in the first degree involving the photographs of S.S. This count, which involved the photographs of S.S., was dismissed by the State on or very near the eve of trial.

The record shows that one of several possible reasons for the dismissal lies in the contents of a videotaped interview of S.S. conducted by two DFS employees, Natalie Chamberlin and Becky Clevinger, at the Division's offices in Marshall on

10. In August 2000, a significantly revised version of section 573.025 went into effect. Section 573.025.1, RSMo 2000, now provides that "[a] person commits the crime of promoting child pornography in the first degree if, knowing of its content and character, such person possesses with the intent to promote or promotes obscene material that has a child as one of its participants or portrays what appears to be a child as a participant or observer of sexual conduct." *See State v.*

*Hagan,* 79 S.W.3d 447, 451–53 (Mo.App.2002) (noting the differences between the two versions of Section 573.025 and applying the one in force on the date the defendant was alleged to have committed the offense). In the instant case, the applicable statute is Section 573.025, RSMo 1994, since the State alleged (and the jury found) that appellant took the photographs of R.S. "between the dates of May 31, 1998 and May 30, 2000."

May 30, 2000, the day appellant was arrested. During that interview, S.S., who was then six years old, told both Chamberlin and Clevinger that his mother Michelle had taken nude pictures of him. Specifically, he told Clevinger about a particular nude photograph that Michelle took while he was sitting or lying on his back:

My mom has done it before, she took my clothes off. I don't know who took my clothes off, but somebody took my clothes off, and then, she put my knees like this [spreading his legs apart] and she took a picture of me.

Asked by Clevinger what Michelle took a picture of, S.S. replied "This," pointing to his genital region.[11] S.S. went on to tell Clevinger that after his mother took that photograph, when he asked her for some clothes to wear since his "body was feeling cold, and real bad and things," she wouldn't get him any because "she didn't want me having clothes on." S.S. told Clevinger that, shortly afterward, Michelle told him "she's not gonna put any clothes on me." S.S. also told Chamberlin that appellant had never taken any pictures of S.S. It was evidently this information that led to the original protective order removing the children from Michelle's custody after appellant was arrested.

On February 11, 2002, appellant's trial counsel deposed S.S., who was then eight years old. During that deposition S.S. flatly denied ever having told anyone that his mother ever took any pictures of him. The State stipulated that if called as a witness, S.S. would testify in conformance to his deposition testimony.

In an offer of proof, counsel for appellant submitted the three nude photographs of S.S. and the videotaped DFS interview of S.S. into evidence. The trial court sustained the State's objections to their ad-

mission into evidence. The trial court also denied defense counsel's request to call S.S. as a witness regarding the photographs.

■ We review the trial court's decision to exclude the evidence offered by defense counsel for abuse of discretion. *State v. Williams*, 97 S.W.3d 462, 468 (Mo. banc 2003); *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990). While we generally will not interfere with a trial court's discretionary ruling on the exclusion of evidence, we will do so when there is a clear showing of abuse of that discretion. *State v. Ray*, 945 S.W.2d 462, 467 (Mo.App.1997). After thoroughly reviewing the record and the law, we agree with appellant that the trial court abused its discretion and prejudicially erred in excluding the evidence in question.

In this regard, the Supreme Court of Missouri's very recent decision in *State v. Barriner*, 111 S.W.3d 396 (Mo. banc 2003), is instructive. In *Barriner*, a double first-degree murder case, police seized several strands of hair at the crime scene, two of which were found in "significant locations." *Id.* at 399. One of the strands was found on the thigh of one of the victims, and the other was found within one of the knots in the rope used to bind the other victim. *Id.* An expert witness called by the State had conducted an examination of the two hairs, which evidently showed that neither matched samples taken from the defendant and the victims. When counsel for defendant attempted to cross-examine the witness about the two strands of hair, the State sought to prevent defense counsel from eliciting any such testimony by making a motion in limine, arguing that " 'there has been no connection of the hair evidence in any of this to any individuals

---

11. We have examined the three nude photographs of S.S. offered by appellant, and one of them (defendant's Exhibit E) is similar to S.S.' description.

connected in this case.' " *Id.* at 399–400. The trial court granted the State's motion and directed defense counsel " 'not to offer evidence that certain hair samples that were retrieved were not related to either the Defendant or the victims.' " *Id.* at 400.

On appeal the State argued, as it does in the instant case, that the trial court correctly excluded the evidence since it did not exculpate the defendant and improperly tended to identify a third person as the perpetrator. The majority in *Barriner* began its legal analysis on the issue of trial court error [12] as follows:

> Generally, a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of the evidence is substantially outweighed by its costs (such as undue delay, prejudice or confusion). When the evidence is merely that another person had opportunity or motive to commit the offense, or the evidence is otherwise disconnected or remote (and there is no evidence that the other person committed an act directly connected to the offense), the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury.

*Id.* (citations omitted). The Court then noted that the hair evidence the defendant sought to introduce showed more than the mere motive or opportunity of another person to have committed the charged crimes, was not disconnected or remote, and "could indicate another person's interaction with the victims at the crime scene." *Id.* Accordingly, the Court proceeded to hold that the defendant "was entitled to present to the jury this evidence of another person's direct connection to the murders. This case does not present one of the limited circumstances in which evi-

dence tending to show that another person committed the offense is properly excluded." *Id.*

The *Barriner* majority also held that there was no other reason for the trial court to have excluded the hair evidence offered by the defendant, as it was both logically and legally relevant. Quoting *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002), for the proposition that evidence is logically relevant "if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case," the Court held that the evidence was logically relevant in that it "would have tended to undercut the state's theory" that the defendant removed one of the victims' clothes and bound the other with a rope. *Barriner*, 111 S.W.3d at 400–01. Observing that evidence is legally relevant "if its probative value outweighs its costs—prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or cumulativeness," the court also held that the evidence was legally relevant, noting that the hairs had "a high probative value," would not have confused or misled the jury, could have been elicited quickly from a witness who had already taken the stand, and would not have been cumulative. *Id.* at 401. The Court concluded its error analysis by stating that in light of the hair evidence's high probative and exculpatory value and the minimal costs of its admission, the trial court clearly abused its discretion in excluding it. *Id.*

As in *Barriner*, the photographic and testimonial evidence of S.S. appellant sought to introduce showed more than the mere motive or opportunity of another

---

12. Six of the court's seven judges concurred in this portion of the opinion.

person to have committed the charged crime, was not disconnected or remote, and could indicate another person's interaction with the victim at the crime scene. The excluded photographs were found at the same time and in the same Ziploc bag as those admitted into evidence against appellant. Furthermore, like the photographs of R.S., they were Polaroid pictures, and were similar in appearance, sexual content, and setting. Moreover, although they are somewhat more indirectly exculpatory than the hair evidence in *Barriner*, the photos and related testimony offered by appellant constituted material evidence of another person's connection to the crime with which appellant was charged and convicted.

Also, as in *Barriner*, there was no other reason for the trial court to have excluded the evidence offered by appellant, as it was both logically and legally relevant. As discussed earlier, in determining his guilt or innocence on the promoting child pornography charge, the key question before the jury was whether or not appellant took the photographs of R.S. In light of the somewhat unusual circumstances of this case, the evidence offered by appellant was logically relevant since it clearly undercuts the State's theory of his guilt [13] and tends to make the existence of a material fact (e.g., appellant was the person who took the photos of R.S.) less probable than it would be without it. *See also State v. McCoy*, 69 S.W.3d 482, 485 (Mo.App.2000) (to be logically relevant, evidence need not

be conclusive, but need only tend to prove or disprove a fact in issue); *State v. Richardson*, 838 S.W.2d 122, 124 (Mo.App.1992) (same).

The evidence offered by appellant was also legally relevant, as its probative value outweighed any attendant costs. It had substantial probative value in helping establish appellant's defense that he was framed by Michelle, was not likely to have confused or misled the jury,[14] could have been elicited without causing undue delay or wasting time (most of the witnesses had already been called and the videotaped interview of S.S. was less than an hour long), and obviously would not have been cumulative. Indeed, the evidence would have allowed the jury to hear and determine all of the facts and circumstances surrounding the charged offense, rather than only the subset selected and presented to it by the State.

Finally, although this was not an issue in *Barriner*, we also hold that appellant was entitled to present the excluded evidence to the jury in order to rebut R.S.' claim, during the State's case in chief, that appellant had taken pictures of S.S. with his pants down and had told her, "The same thing happened to you." *See State v. Ford*, 639 S.W.2d 573, 576 (Mo.1982) ("As a general rule, evidence explaining evidence previously introduced, or showing that the inference arising or sought to be drawn therefrom is not warranted, is admissible. This rule is especially applicable

---

**13.** Although the State would have us do so, we cannot turn a blind eye to the fact that the State proceeded all the way from indictment to near the eve of trial on the theory that appellant had taken *both* sets of pictures. We also note that, although the State endorsed Michelle as a witness and used her testimony during the pretrial evidentiary hearing, it did not call her at trial.

**14.** In *Barriner*, the court observed that even if the hair evidence excluded by the trial court had failed to directly connect another person to the murders, "physical evidence obtained from murder victims' bodies lacks the same potential for confusion or misdirection caused by evidence found at a remote location or isolated evidence of another person's motive or opportunity." 111 S.W.3d at 400 n. 3. The same can be said about the excluded evidence and testimony in the instant case.

where [the] accused seeks to explain incriminating evidence introduced by the state."); *McCoy*, 69 S.W.3d at 484. For these reasons, we hold that the trial court erred and abused its discretion in excluding the physical evidence and related testimony concerning the nude photographs of S.S.

■ We now proceed to the question of prejudice. A rebuttable presumption of prejudice is created when admissible evidence is improperly excluded in a criminal case. *Barriner*, 111 S.W.3d at 401; *Ford*, 639 S.W.2d at 575. *See also State v. Rhodes*, 988 S.W.2d 521, 529 (Mo. banc 1999) ("Trial court error, timely preserved, creates the presumption of prejudice."); *Burton v. State*, 641 S.W.2d 95, 99 (Mo. banc 1982) ("Errors committed in the context of a criminal trial are presumed to be prejudicial, but that presumption is not conclusive and may be overcome by the facts and circumstances of the particular case."); *State v. Dale*, 874 S.W.2d 446, 452 (Mo.App.1994) ("Error committed in a criminal case is presumed prejudicial, but that presumption is not conclusive and may [be] rebutted by the facts and circumstances of the case."); *State v. Grant*, 784 S.W.2d 831, 834 (Mo.App.1990) ("Errors committed in a criminal trial are presumptively prejudicial. The presumption may be rebutted by the facts in a particular case.")

■ In criminal cases where, as here, the defendant has properly preserved the error for appellate review, it is State's burden to rebut this presumption by demonstrating that it was harmless beyond a reasonable doubt. "When a defendant properly preserves his point on appeal and the point is determined by the appellate court to have resulted in error, the state must overcome the presumption of prejudice by proving beyond a reasonable doubt that the error is harmless." *State v. Taylor*, 739 S.W.2d 220, 223–24 (Mo.App.1987); *see also State v. Miller*, 650 S.W.2d 619, 621 (Mo. banc 1983) ("[the] prevailing standard is that error can be declared harmless only if we are 'able to declare a belief that it was harmless beyond a reasonable doubt.' ") (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *State v. Conley*, 938 S.W.2d 614, 620 (Mo.App.1997) (error in the admission of evidence will be declared not prejudicial only if the reviewing court can declare a belief that it was harmless beyond a reasonable doubt).[15]

■ "In assessing whether the exclusion of evidence was harmless beyond a reasonable doubt, the facts and circumstances of the particular case must be examined, including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." *Felder*, 88 S.W.3d at 914. We have already discussed the nature of the charge and the evidence presented against appellant. We, therefore, now examine the role the excluded evidence would have played in the defense's theory.

Although the State explicitly waived any foundation objections, defense counsel offered to have Michelle, O'Neal, and Miller

---

**15.** In *Barriner*, the court noted that the State can rebut the presumption of prejudice by showing that proof of the defendant's guilt is overwhelming, 111 S.W.3d at 401, since under such circumstances the outcome of the trial would have been the same with or without the challenged evidence. *See also State v. Sykes*, 628 S.W.2d 653, 657 (Mo.1982); *Felder v. State*, 88 S.W.3d 909, 914–15 (Mo.App. 2002); *State v. Rush*, 949 S.W.2d 251, 256 (Mo.App.1997); *State v. Davidson*, 947 S.W.2d 87, 89 (Mo.App.1997); *State v. Troupe*, 863 S.W.2d 633, 636 (Mo.App.1993). As to the promoting child pornography charge against appellant, this is clearly not such a case.

identify the photographs and explain the circumstances under which they were found and seized. Defense counsel also specifically proposed to ask Michelle if she had taken the photographs, and if, as expected, she denied having done so,[16] planned to play the videotape for the jury to impeach her and to show her bias against appellant. Appellant's counsel also offered to prove that Chamberlin and Clevinger were not the only persons who heard and saw S.S. make statements that Michelle had taken nude Polaroid photographs of S.S., stating that Officer Miller would be called to testify regarding what he observed and described in his police report.[17] Finally, defense counsel offered to call S.S., who had been subpoenaed and was both present and available to testify, to the witness stand to question him about the photographs. Had the defense been allowed to call S.S., the record shows it planned to impeach him with and argue the truth of his prior inconsistent statements concerning the photographs to Chamberlin, Clevinger, and Miller pursuant to section 491.074, which provides: "Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement." *See State v. Clark*, 756 S.W.2d 565, 568–69 (Mo.App.1988) (under section 491.074, a witness's prior inconsistent statements can be used both to impeach contrary testimony by the declarant at trial and as substantive evidence of its truth regardless of

which party called the witness); *State v. Jennings*, 815 S.W.2d 434, 443–44 (Mo. App.1991) (under section 491.074, a witness's prior inconsistent statements are admissible as substantive evidence even when the witness at trial denies having made them as long as other evidence establishes that such statements were made; testimony of police officers and documentary videotape sufficiently established that such statements were made); *State v. Woodworth*, 941 S.W.2d 679, 691–92 (Mo. App.1997) (when witness at trial denies having made prior inconsistent statement, videotaped or otherwise contemporaneously recorded proof that prior statement was made is unnecessary, particularly when the declarant is available for cross-examination at trial).

While appellant was permitted to elicit testimony from Michelle that from mid–1999 through February of 2000, she considered appellant's home in Napton to be her residence and freely "came and went from the house" using her key, as well as admissions that she was present in his home on at least one occasion during April or May of 2000 and that the trip she and some of the children made back to Napton to retrieve Autumn's "forgotten" swimsuit was merely a subterfuge to conceal her true intentions, it is clear to this court that without the evidence excluded by the trial court, appellant's defense theory—that he had been "set up" by his ex-wife Michelle, who took the explicit photographs of both R.S. and S.S. and planted them in appellant's home to be found later by Autumn—was, for all practical purposes, eviscerated.

---

**16.** On direct examination by appellant, Michelle denied ever having taken a picture of any of her children using a Polaroid camera.

**17.** After cross-examining Miller during the State's case in chief, counsel for Appellant specifically reserved the right to recall Miller during the defense's case in chief on the issue

of what he heard S.S. say about the photographs. Although the record is not entirely clear, it appears that Miller had no independent knowledge and simply observed the DFS interview of S.S. by Chamberlin and Clevinger through a one-way mirror in the interview room.

Furthermore, the prosecutor took full advantage of the trial court's rulings forbidding appellant from presenting the excluded evidence when, during closing argument, he told the jury:

The defense now seems to be that Autumn did it or Michelle did it. I make no defense of Michelle Sanders. But in the realm of human imagination, to say that she would put this child, even if she did have the opportunity, which she did not, you can only reach that conclusion through just pure speculation. [T]here is no evidence that she was in that house other than the one time when she told you she was there in the front room. There is no evidence that she put anything in that house. There is no evidence that she was anywhere near those children's clothing that was shown before you today. There is no evidence of this great conspiracy. None whatsoever. He wants to dirty her up, and I don't care.... No matter how dirty she is, it doesn't change the facts of this case, which is that this defendant perpetrated on this little girl, a horrific crime.

Although argued by appellant in his brief, we need not decide whether the trial court's rulings denied him due process of law. They did prevent the introduction of evidence pertinent to the defense, thus denying appellant a meaningful opportunity to submit to the jury in his defense all of the relevant, material facts bearing upon the issue of his guilt or innocence. *See State v. Copeland*, 928 S.W.2d 828, 837 (Mo. banc 1996) ("The denial of the oppor-

tunity to present relevant and competent evidence negating an essential element of the state's case may, in some cases, constitute a denial of due process."): *State v. Williams*, 729 S.W.2d 197, 201 (Mo. banc 1987) ("The prevalent theme in due process cases is that in a criminal prosecution the accused must be allowed to present a complete defense."); *State v. Ray*, 637 S.W.2d 708, 710 (Mo. banc 1982), *overruled on other grounds*, *State v. Jones*, 716 S.W.2d 799, 800 (Mo. banc 1986) ("Although due process does not require all relevant evidence to be received nor prohibit the refusal of highly prejudicial albeit relevant evidence, relevance, not prejudice, is the touchstone of due process, and this proposition is especially urgent where the evidence in question might tend to prove innocence.")

We hold that the State has not overcome the presumption of prejudice by demonstrating that the error committed by the trial court in excluding the evidence and testimony offered by appellant was harmless beyond a reasonable doubt. Accordingly, appellant's conviction for promoting child pornography in the first degree, Section 573.025, RSMo, is reversed, and the case is remanded for a new trial.[18] *See Barriner*, 111 S.W.3d at 401 (reversing first-degree murder convictions since there was a "reasonable probability that the trial court's exclusion of the admissible hair evidence affected the outcome of the trial");[19] *Ford*, 639 S.W.2d at 576 (first-degree murder conviction reversed because the court found it "impossible to conclude

**18.** Before commencing any retrial, we strongly urge the State to give careful thought to the question of whether hearsay statements admissible solely by virtue of sections 491.075 or 491.680 can be used as substantive evidence in a prosecution for a crime (in particular, the crime of promoting child pornography in the first degree, § 573.025.1) which does not constitute "an offense under chapter

565, 566 or 568, RSMo" (quoting §§ 491.075.1 and 491.075.2), or a "criminal prosecution under the provisions of chapter 565, 566 or 568, RSMo" (quoting § 491.680.1), either with or without a limiting instruction.

**19.** Four of the court's seven judges concurred in this portion of the opinion.

with any degree of certainty that appellant was not prejudiced by the exclusion" of a defense witness's testimony); *Ray*, 945 S.W.2d at 469 (second-degree murder conviction reversed where trial court erroneously excluded various evidence offered by defendant since the court was "convinced that the error contributed to the result reached by the jury" and thereby deprived him of a fair trial). The judgments as to the sodomy convictions are affirmed.

HAROLD L. LOWENSTEIN, Judge, concurs.

JOSEPH M. ELLIS, Chief Judge, Presiding Judge, concurs in part and dissents in part, in separate opinion filed.

JOSEPH M. ELLIS, Judge, concurring in part and dissenting in part.

I concur in that portion of the majority opinion reversing Appellant's conviction for promoting child pornography. I must respectfully dissent, however, from that part of the majority opinion affirming Appellant's remaining convictions.[1] The majority offers no explanation as to why only the one conviction should be reversed and the others affirmed, and I can discern no reason or justification for doing so.[2] Indeed, there is a very compelling reason to do otherwise.

"[T]he erroneous exclusion of evidence in a criminal case creates a presumption of prejudice which 'can only be overcome by a showing that such erroneous exclusion was harmless error beyond any reasonable doubt.'" *State v. Bowlin*, 850 S.W.2d 116, 118 (Mo.App. S.D.1993) (quoting *State v.*

*Bashe,* 657 S.W.2d 321, 325 (Mo.App. S.D. 1983)). The burden of showing that the exclusion was harmless beyond any reasonable doubt rests with the State. *Id.*

In this case, the State fails to even address the issue of prejudice in its brief on appeal and relies entirely upon its argument that the evidence was not relevant. That argument is rejected by the majority opinion, and the exclusion of the evidence is found to be error. *Maj. Op.* at 23. Under these circumstances, it simply cannot be said that the State has borne its burden of showing that the exclusion of the evidence was harmless beyond a reasonable doubt as to the sodomy counts.

Likewise, the majority has wholly failed to explain how the presumption of prejudice as to the sodomy counts has been rebutted on the record in the case or how the erroneous exclusion of this evidence was harmless beyond a reasonable doubt. Clearly, as recognized by the majority, the evidence that Appellant sought to introduce, if believed, would have served to challenge the credibility of R.S.'s assertions that Appellant took the pornographic pictures of herself and her brother. The majority apparently ignores, however, the effect this evidence might have upon R.S.'s credibility in general and the effect that discrediting the photographic evidence, which the jury was allowed to consider in rendering its verdicts on the sodomy counts, might have upon the State's case on those counts. The only evidence presented at trial establishing that Appellant committed acts of sodomy on R.S. came from statements made by R.S. Thus, the

---

1. Since I would grant Appellant's Point II as to all charges, requiring reversal and remand for a new trial on all charges, it is my view that the majority's discussion, analysis and disposition of Appellant's Point I, albeit scholarly and well written, is unnecessary, of no force or effect, and at best, *obiter dictum.*

2. The majority, in setting forth Appellant's Point II, states that his argument goes to "his conviction on the promoting child pornography charge," *Maj. Op.* at 19, but I see nothing in Appellant's point relied on that limits it only to that charge.

credibility of her statements was the paramount issue in the State's case on the two counts of sodomy, and it is difficult to discern how the exclusion of evidence which might have called into question the credibility of R.S.'s statements could be viewed as harmless beyond a reasonable doubt.

To put this issue in perspective, it must be remembered that Appellant was convicted based exclusively on what would be inadmissible evidence but for § 491.075.[3] In fact, even though the trial court granted the State's motion to permit video recording of the child victim's deposition with Appellant excluded, pursuant to § 491.680, and that deposition was taken, the State didn't even present the videotaped deposition at trial. Rather, the State relied on video taped interviews of the child victim with counselors and DFS personnel as substantive evidence pursuant to § 491.075. Of course, Appellant was neither personally present nor represented by counsel during those interviews. Thus, in this case, more so than most, the evaluation of the credibility of the child victim, who was four and five years old at the time

of most of the evidentiary interviews, was essentially the jury's only function.

In this regard, it should be noted that child sexual abuse is a heinous crime and a serious societal problem in this country. In our zeal to address the issue, our legislatures and courts, by adoption of statutes such as §§ 491.075 and 491.680 and other procedural mechanisms, have opted to weaken evidentiary rules developed through centuries of case law permitting confrontation and the use of cross-examination, " 'the greatest legal engine ever invented for the discovery of truth.' " *State v. Bobbitt*, 242 Mo. 273, 146 S.W. 799, 805 (1912) (*quoting 5 Wigmore on Evidence* § 1367). In our desire to prevent subjecting children to emotional trauma or other harm, we must be ever mindful that these are extremely serious offenses, often permitting sentences of up to life imprisonment, as was the case in the instant appeal. So it is that in cases such as this, it is imperative that the jury evaluate even more critically than normal the child victim's credibility, and the presumption of prejudice resulting from the erroneous exclusion of any evidence bearing on that

---

**3.** This writer's research has failed to disclose any reported Missouri case where all the evidence necessary to sustain the conviction was inadmissible but for § 491.075. In all cases found, at least some admissible evidence of the offense was presented in addition to the § 491.075 evidence. *See e.g., State v. Tringl,* 848 S.W.2d 29 (Mo.App. E.D.1993) (court admitted testimony as to out-of-court statements made by alleged rape and sodomy victim under age 12; victim also testified at trial and defense had opportunity to cross-examine her); *State v. Benwire,* 98 S.W.3d 618 (Mo. App. W.D.2003) (court admitted alleged child victim's out-of-court statements; victim also testified at trial and denied having made the statements); *State v. Werneke,* 958 S.W.2d 314 (Mo.App. W.D.1997) (six-year-old child's out-of-court statements describing defendant's sexual assault upon her were admissible; child victim testified at trial); *State v. Foster,* 854 S.W.2d 1 (Mo.App.1993) (admitting hear-

say testimony of witness as to what alleged victim of sodomy said to her, as well as alleged victim's out-of-court written statement to police officer; victim testified at trial and was subject to cross-examination); *State v. Silvey,* 894 S.W.2d 662 (Mo. banc 1995) (admitting out-of-court statements of alleged child sexual abuse victim; victim testified at trial and was subject to cross-examination); *State v. White,* 873 S.W.2d 874 (Mo.App. E.D. 1994) (out-of-court statements by alleged child sodomy victim held admissible as substantive evidence if the victim testifies at trial); *State v. Phelps,* 816 S.W.2d 227 (Mo.App. S.D.1991) (admitting statements alleged child victim made to juvenile officer; victim testified at trial and defendant had opportunity to cross-examine her); *State v. Boyer,* 803 S.W.2d 132 (Mo.App. S.D.1991) (admitting out-of-court statements of alleged child sodomy victim; victim testified at trial and was subjected to cross-examination).

credibility should be stronger and harder to overcome than in virtually any other type of case.

In the case *sub judice,* Appellant's theory of defense on both the sodomy counts and the promoting child pornography count was that he had been "set up" by his ex-wife's planting of evidence and that R.S.'s testimony had been coached and was not credible. As noted in the majority opinion, the excluded evidence "had substantial probative value in helping establish appellant's defense that he was framed by Michelle," *Maj. Op.* at 22, and without the evidence excluded by the trial court, appellant's theory of defense "was, for all practical purposes, eviscerated." *Id.* at 24. The majority concludes that the exclusion of the evidence "did prevent the introduction of evidence pertinent to the defense, thus denying appellant a meaningful opportunity to submit to the jury in his defense all of the relevant, material facts bearing upon the issue of his guilt or innocence." *Id.* at 24–25. These statements hold true with regard to his defense to the sodomy counts as well as the promoting child pornography count.

On the record in this case, I simply cannot conclude that the erroneous exclusion of this evidence was harmless beyond a reasonable doubt with regard to the sodomy counts, and neither the State nor the majority has shown otherwise. I believe that Appellant's conviction should be reversed as to all counts and the entire cause should be remanded for a new trial.